(No. 11350.—Decree affirmed.)

JAMES A. GOACHER *et al.* Plaintiffs in Error, *vs.* CHARLES
T. BATES *et al.* Defendants in Error.

*Opinion filed October 23, 1917.*

1. PARTNERSHIP—*question of existence of partnership, as be-
tween the parties, must be determined from the circumstances.* As
between the parties the question of the existence of partnership
relations is one of intention, to be determined from all the facts
and circumstances properly in evidence.

2. SAME—*when agreement for share of profits does not show a
partnership.* An agreement between a banker and a stock buyer
whereby the former was to furnish the money for buying the stock
and receive a share of the profits but not to stand any losses does
not show a partnership.

WRIT OF ERROR to the Circuit Court of Greene county;
the Hon. ROBERT E. SHIRLEY, Judge, presiding.

D. J. SULLIVAN, for plaintiffs in error.

THOMAS HENSHAW, and GRAHAM & GRAHAM, for de-
fendants in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

The plaintiffs in error, James A. Goacher, Nancy A.
Goacher, Mary C. Fanning, Lennie Goacher, Clara Nettie
Barbour and Dave Barbour, filed their bill at the February
term, 1911, of the circuit court of Greene county, against
defendants in error, Charles T. Bates, Mary R. Bates, Hugh
Barber and Ernie Carmean, to set aside deeds conveying
certain real estate from the plaintiffs in error (except Len-
nie Goacher) to Charles T. Bates, and to require Bates to
surrender for cancellation two promissory notes, one exe-
cuted by Clara Nettie Barbour and Dave Barbour for $700
and one executed by James A. Goacher and Lennie Goacher
for $2000, and to require Bates to account for certain per-
sonal property which he received from Lennie Goacher, and

that there be an accounting of the partnership property and transactions of the firm of Goacher & Bates, and that Charles T. Bates, Hugh Barber and Ernie Carmean be decreed to pay James A. Goacher for the use and occupation of the lands conveyed by the various plaintiffs in error to Bates and in turn by him conveyed to Hugh Barber.

Lennie Goacher is a son of James A. and Nancy A. Goacher. From the time he was about seventeen years of age until the summer of 1909 he had been engaged in a small way in dealing and trading in live stock in the community in which he resided, in Greene county. In June, 1909, he made some arrangement with Charles T. Bates, who was cashier of the First National Bank of Roodhouse, whereby he was to secure funds from the bank and engage more extensively in buying and selling live stock of all kinds. As to the exact nature of this arrangement there is a sharp dispute between Goacher and Bates. At that time Goacher was twenty-three years of age, and he testifies that his assets over and above his liabilities amounted to about $200. He engaged in the business of buying and selling live stock until about the first day of November, 1910, transacting his business at the First National Bank of Roodhouse. From some time in August until the last of October, 1910, he had been informed at various times that he had a large overdraft at the bank which must be met. His indebtedness at the bank on October 31, 1910, amounted to over $6800. At that time Bates became insistent upon a settlement, and after negotiating with the parents of Lennie Goacher, his brother, Bert, his grandmother, Mary C. Fanning, and his aunt and uncle, Clara Nettie Barbour and Dave Barbour, for a period of five days, the matter was settled by James A. Goacher and his wife conveying to Bates eighty acres of land, against which there was a mortgage indebtedness of $4000, and by Mrs. Fanning and Dave Barbour and his wife conveying to him forty acres of land in which Mrs. Fanning had a life estate and Mrs. Barbour the remainder, and by Dave Bar-

bour and his wife executing and delivering to Bates their promissory note for $700, and James A. Goacher and Lennie Goacher delivering to him their note for $2000, and by Lennie Goacher delivering to him nine horses and some hay and a note for $110 given to him by one of the men with whom he had dealt during his live stock transactions.

The cause was referred to the master in chancery to report the testimony, only. Upon consideration of the testimony as reported to him, the chancellor found the issues for complainants as to the two notes of $700 and $2000, respectively, and ordered that the same be delivered up for cancellation, and as to the note for $110, which was ordrered to be delivered up to Lennie Goacher. He found against the complainants as to the other matters complained of, and held that the conveyances to Charles T. Bates of the real estate in question were valid.

Complainants make three contentions: First, that there was a partnership existing between Charles T. Bates and Lennie Goacher in the business of buying and selling live stock; second, that there was, in fact, no indebtedness due the First National Bank of Roodhouse by the firm of Goacher & Bates; and third, that the deeds from James A. Goacher and wife and Mrs. Fanning and the Barbours were procured by fraud and duress.

There is a sharp conflict in the testimony of Lennie Goacher and Charles T. Bates as to the nature and terms of the agreement they entered into. Goacher testifies that in June, 1909, Bates called him into the back room of the bank, and, after telling him that he saw he was doing a nice business and making some money, asked him if he did not want to trade with him, stating that he would furnish the money, Goacher could do the work and they would divide the profits or the losses. He states that he accepted this proposition and began buying live stock and paying for it by drawing his checks on the First National Bank of Roodhouse. Bates, on the other hand, testifies that Goacher

came to him either in May or June, 1909, and stated that he wanted to do more business than he was doing, and he could make more money for himself if Bates would assist him by furnishing him money in his business; that he was willing to divide profits with Bates if he would stand back of him at the First National Bank; that they went into the back room of the bank together and he asked Goacher how extensively he wanted to trade, and he stated that by buying a load of cattle and bringing them up from St. Louis and selling them he could make a good profit and that he was willing to divide the profits with him, and that he consented to that arrangement. He testifies further that he said: "Lennie, when a fellow goes into dealings in live stock he makes losses; I am not going to stand for any losses; if you divide the profits with me I will stay with you;" and that Goacher responded that he was not going to make any losses. Bates further testifies that he agreed to guarantee to the bank Goacher's account and in return for that was to receive one-half of any profits made by Goacher in his transactions but was not to have any further interest in the business.

It is contended on the part of plaintiffs in error that under Bates' own testimony he is liable as a partner. We do not so understand the law. If the arrangement between them was as testified to by Goacher the effect would be to constitute them partners. If, on the other hand, the testimony of Bates discloses their contract it does not necessarily follow that it constituted the forming of a partnership. In *Smith* v. *Knight*, 71 Ill. 148, it was held that there was no partnership created by a contract to receive a part of the profits of a business for the use of money advanced for the purpose of enabling a firm to which it was furnished to carry on its business. In *Fougner* v. *First Nat. Bank of Chicago*, 141 Ill. 124, it was held that while sharing in profits is one test as to whether a partnership exists, that test is subject to the qualification that it must be a sharing

in the profits as distinguished from making the profits the measure of compensation for services or for the use of property or money in the business. As between the parties the question of the existence of partnership relations is one of intention, to be gathered from all the facts and circumstances. (*National Surety Co.* v. *Townsend Brick Co.* 176 Ill. 156.) The proof taken before the master was very voluminous. A consideration of all the circumstances proven tends to support the testimony of Bates as to the nature of the contract entered into, and we are therefore of the opinion that the chancellor properly found that no partnership existed between Bates and Goacher. Among those circumstances are some that are quite significant. At the time this arrangement was entered into, Goacher, according to his own testimony, possessed practically no property whatever. While those who knew him testified generally as to his good reputation for honesty and industry, it is improbable, with the business experience of Bates, that he would enter into a full and unlimited partnership with Goacher in the business of buying and selling live stock knowing that he was wholly irresponsible financially. Prior to the time this arrangement was made Goacher transacted some business with the First National Bank of Roodhouse and during that time had borrowed money from the bank, on which he paid interest. After making this arrangement, and on November 9, 1909, the account being then overdrawn for more than $2400, Goacher gave his note to the bank for $2500, which amount was deposited to his credit. This note by its terms drew interest at the prevailing rate. Goacher had no means when he began his trading operations subsequent to June, 1909, and he had an overdraft at the bank practically all the time. He paid interest on his note and each month paid interest on the amount of his overdraft, thus paying the bank interest on all the money that he was using in his business. This strongly corroborates the testimony of Bates that he simply agreed to act as guarantor to the bank of

Goacher's account, for which accommodation he was to receive half of all the profits of the business. During the negotiations between Goacher, through members of his family and friends, and Bates, which resulted in the settlement, Goacher made no claim that he was not responsible for this entire indebtedness. During all that time he made no reference to the fact that he considered Bates to be partly or wholly responsible but only contended that he did not owe this amount at the bank. Considering the whole testimony, we are of the opinion that the court properly found that no partnership existed.

On the question whether any indebtedness to the bank actually existed, we have nothing in this record as a basis for determination except the books of the bank. Goacher contends that he did not receive credit for all deposits made by him. He testifies that he received cash for all but one sale made by him and that the money on that occasion was deposited in the First National Bank; that on every other occasion when he made a sale he received either a check or a note, and that in every instance except one these were immediately deposited in the First National Bank. He admits that he cashed one check of less than $100 at another bank, but testifies that the proceeds were spent for the legitimate expenses of carrying on his business. He does not point out a single specific instance where the bank failed to give him the credit which he considers he is entitled to. It appears from the record that he had his bank book and his checks and vouchers prior to the hearing and during the hearing, and that the records of the bank were introduced in evidence and prior thereto had been open to his inspection. He complains that the method employed by the bank in keeping the record of his account makes it impossible for him to discover and point out wherein the account is wrong. The principal criticism made of the method employed by the bank in keeping this account is, that when the account was overdrawn and checks came in and were paid, Bates

made a practice of holding these checks without stamping them paid or entering them upon ·the books of the bank, counting them as cash each day, and that these checks would . be held in this manner until deposits were received sufficient to cover them, when they would be stamped paid and entered on the ledger as of the day the deposits were received instead of the day the checks were actually presented and paid. There is also complaint that Bates made a practice, in keeping his account, of sometimes entering all the deposits made on one day in a lump sum under the name of one of the parties from whom the money deposited had been received, thus making it impossible to determine from the books whether Goacher was properly credited with the money received from all the parties to whom he had made sales. While it is true that this method of keeping the record of this account might tend to confuse one who undertook to check it up to. determine whether credit had been given for all the many checks and notes turned into the bank, under the circumstances it should not have been a difficult matter for Goacher to have pointed out at least one instance where the bank had failed to give him credit. This is all the more true when the amount of the overdraft is taken into consideration, and when it is also considered that the loss, if any, occurred during the last three months of Goacher's trading. While from the records of the bank it appears that Goacher's account was overdrawn practically all the time, some time during each month of the period in which he was trading under these arrangements with Bates the books of the bank shows a balance in his favor. This would indicate that up to that time, at least, aside from the amount of the note for $2500, no loss had occurred, and that the overdraft was due to the fact that he had stock on hand or that he had not yet received returns from stock that had been sold. Thus, from June 1 to June 23, 1909, there was an overdraft which ranged from $651 to $1542.99. On June 24 there was a balance of $53.76. On June 25

there was an overdraft of $14.74. From that day until
July 13 there was a balance ranging from $8.70 to $1643.72.
From July 15 to the end of the month there was an alter-
nating overdraft and balance in small amounts from day to
day. On August 5 there was a balance of $5.58. During
the remainder of that month and the month of September
there was an overdraft. During the month of October there
was an overdraft. From November 11, 1909, until the end
of the month, with the exception of November 18, there
was a balance. During the greater part of the month of
December there was also a balance. From January 8 to
January 15, 1910, there was a balance. During the greater
part of the months of February and March, 1910, there was
a balance. On seven different days during the month of
April, 1910, there was a balance. During all the month of
May there was an overdraft. On June 10, 11 and 17 there
was a balance. On July 14 there was a balance. On August
17 there was a balance of $1158.80 and on August 20 there
was a balance of $316.20. On September 8, 1910, there
was a balance of $372.92 and on September 9 a balance of
$329.42. On September 27 there was a balance of $267.84.
This is the last balance shown on the account.

From the testimony it appears that the custom of hold-
ing as cash checks which had been presented and paid when
the account was overdrawn was practiced not earlier than
the month of August, 1910. On August 23, 1910, Bates
notified Goacher that the overdraft amounted to $6286. It
is true that it is impossible to determine from the books as
introduced in evidence the true state of the account on any
particular day after that practice had commenced. If the
testimony of the employees of the bank is to be believed
that this practice was not employed prior to August, 1910,
then it is only subsequent to that time that the loss, if any,
occurred, because prior to that time the account was occa-
sionally balanced, so that the principal being used, exclusive
of the $2500 borrowed, had not been lost. When the $2500

which Goacher borrowed on November 9, 1909, is taken into account it is impossible to determine from the account disclosed by the records of the bank when the venture became a losing one, as Goacher constantly had some live stock on hand. Assuming that the records of the bank are correct,—and there is nothing in this record to impeach them,—when considered in connection with the testimony of the employees of the bank, the principal losses must have occurred during the last three months of Goacher's operations. If, as he claims, the bank during that time did not give him credit for deposits made by him, it should have been a comparatively easy matter for him to have shown at least one instance where that occurred. No attempt is made to show any such fact. It is only by criticism of the methods of the bank in transacting its business and by insinuations and pointing out matters which it is claimed give rise to suspicion that counsel for Goacher attempts to show that he has been unfairly dealt with. It is no doubt true that had this account been properly kept and had it represented the actual history of what occurred with reference to each item, had each check been stamped paid and been entered on the day it was paid, and had each item of deposits been entered separately instead of being lumped with other items, the question whether proper credit had been given for all deposits made would be rendered less difficult. Goacher was a man of meagre education and kept no books of account, and depended upon the checks given by him as his record of all money paid out and of the checks received by him as a record of receipts from his sales. That he was negligent in not keeping a proper book of account whereby he could check up on the account kept by the bank is no fault of the bank. There is an utter lack of showing that the books of the bank are not correct and that Goacher was not indebted to the bank on November 9, 1910, in the sum of $6836.32. Goacher admits that on Saturday, October 29, he told his aunt, Clara Nettie Barbour, at Manchester, to

telephone Bates that he had the $6000 which he owed him and would pay him. Bates' son also testified that Goacher told him on that day that he had two checks aggregating $6000 which he would send to his father to balance his account. Bates and his father both testified that on Monday morning, October 31, Goacher told Bates at his home in Roodhouse that he had checks in his pockets sufficient to balance the account. Goacher denies that he was at the Bates home on October 31, and also denies that he told Bates' son that he had checks aggregating $6000 to balance the account. He admits that he did direct his aunt, Mrs. Barbour, to telephone Bates that he had the $6000 he owed him and would send it to him. His explanation is that it was done in a spirit of sarcasm, as Bates knew he did not owe him anything and would not send him any such amount, and he simply wanted to "hand him a package."

The contention that the deeds from James A. Goacher and wife and from Mrs. Fanning and Clara Nettie Barbour and Dave Barbour were obtained through fraud and duress cannot be sustained. The basis of this contention is that Bates claimed that this money had been secured from the bank through false representations made by Lennie Goacher as to the amount of live stock he had on hand; that Bates threatened if the money was not paid at once he would prosecute Lennie and send him to the penitentiary; that he employed the State's attorney of Greene county to assist in making a settlement; that with the State's attorney he called upon James A. Goacher and his wife in the night time and greatly frightened them with his threats, and that the same threats were made to Mrs. Fanning, the grandmother of Lennie, and to Mrs. Barbour and her husband, the aunt and uncle of Lennie, and that as a part of the settlement Bates signed an agreement not to prosecute Lennie on a criminal charge. The proof shows that on Sunday, October 30, Bates and his son called at the Goacher home, where Bates inquired for Lennie. Bates and his father and

his son all testified that Lennie came to the Bates home in Roodhouse on Monday morning, October 31, and stated that he had checks in his pocket sufficient to meet the overdraft and that he would pay when his bank book was balanced. Lennie denies that he was at the Bates house on this day. It is undisputed, however, that at this time Bates was insisting that there was a large overdraft. On the evening of the same day, Monday, October 31, Bates and the State's attorney went to the Goacher home where they found James A. Goacher and his wife. They informed the Goachers of the amount of Lennie's indebtedness at the bank and also stated that he had procured this money by means of false pretenses. On the next day, Tuesday, November 1, Bert Goacher, a brother of Lennie, accompanied by a neighbor, went to Roodhouse and called upon Bates and also called upon other persons in an effort to secure some information in reference to the condition of the account. About that time Lennie and his brother, Bert, on the advice of their father went to their father's attorney at Whitehall, who advised them, after the facts had been detailed by them, that no crime had been committed and that Lennie could not be prosecuted. On the next day, November 2, Bert went again to Roodhouse and made a proposition to Bates by way of settlement. This proposition was rejected. On Thursday morning, November 3, he again called upon Bates in Roodhouse and attempted to effect a settlement. At that time he requested Bates to go out to the Goacher home and see if the matter could not be adjusted. This Bates declined to do until certain checks which had been issued by Lennie and had been dishonored at the bank had been taken care of. Arrangements were made for taking care of these, and at eleven o'clock in the morning of November 4 Bates and the State's attorney, who was acting as his attorney, went to the Goacher home. Lennie was present at this time. After considerable discussion the Goachers proposed to give Bates the eighty acres of land owned by James A. Goacher,

forty acres owned by Mrs. Fanning and the Barbours, nine
head of horses which had been purchased· by Lennie in his
live stock operations, and a stack of hay. Bates agreed to
accept this in full settlement. James A. Goacher and his
wife executed a deed to the eighty acres in question and
Lennie executed a bill of sale for the horses and the hay.
Bates and his attorney, together with Bert Goacher and his
wife, went to Manchester, where Mrs. Fanning and the
Barbours lived. During the negotiations from October 31
to that date Mrs. Fanning and the Barbours had been con-
sulted and were fully advised as to the situation. .They had
been consulted by telephone while the negotiations were in
progress at the Goacher home and had agreed to convey
the forty-acre tract, with the understanding that a settle-
ment in full could be made by the conveyance of that land
and the Goacher eighty-acre tract and turning over the
horses and the hay. After the deed had been prepared in
the Fanning home Bert Goacher advised his aunt, Mrs. Bar-
bour, not to execute it until Lennie's bank book had been
balanced. That enraged Bates and he refused to complete
the settlement on the basis agreed to, and stated that he
would rather prosecute Lennie criminally and send him to
the penitentiary than to take the money. He directed his
attorney to stop the negotiations. After some discussion he
agreed to go ahead with the settlement provided the Bar-
bours would give him their note for $700 and James A.
Goacher and Lennie would execute a note for $2000 and
Lennie would turn over to him a note. for $110 which he
held. This was agreed to and the matter was. settled on
that basis. While it is true that Bates made various threats
during the progress of these negotiations and up to the time
of settlement, the negotiations consumed several days, and
the Goachers were all adults and had ample opportunity for
consultation and reflection. Lennie and his brother, at their
father's suggestion, consulted an attorney, and he informed
them no crime had been committed and that Lennie was

in no danger of criminal prosecution. After receiving the benefit of this advice the Goachers continued their efforts to secure a settlement and, made numerous propositions of settlement to Bates, until finally he agreed to settle the matter upon the conveyance of the real estate and the turning over to him of the horses and hay. We are of the opinion that there was no such fraud or duress used as would affect the transaction. The plaintiffs in error were all adults, of sound mind, consulted together among themselves and with their friends and legal adviser, and insisted upon making the settlement which they are now seeking to have set aside. The promissory notes executed on November 4, 1910, were ordered to be delivered up and canceled upon the ground that they were procured after a settlement had been completed by the agreement to accept the conveyances of real estate and a bill of sale for the horses and hay. Upon this portion of the decree no cross-errors are assigned.

Perceiving no error in the decree of the circuit court it is affirmed.                              *Decree affirmed.*