### In re MARCUSE & CO. *

#### VETTE et al. v. GILES et al.

(Circuit Court of Appeals, Seventh Circuit. January 12, 1922. Rehearing Denied April 4, 1922.)

No. 2855.

1. **Partnership** ⬅➡363—**That trust agreement between special partners was fraud and device to evade objections held not to make them general partners.**

That the reduction of the number of special partners in a limited partnership from five to two, who received contributions from the others under a trust agreement, was a fraud and a device conceived for the purpose of avoiding objections of a stock exchange to limited partnerships having more than two special partners, or to any special partners being engaged in other business, did not render the persons making contributions under the trust agreement general partners, where no detriment was occasioned creditors.

2. **Partnership** ⬅➡352—**Attempt to create limited partnership for prohibited business by complying with repealed law held ineffectual.**

Under the Uniform Limited Partnership Act of Illinois, effective July 1, 1917, no limited partnership was organized by compliance on July 2, 1917, with the old partnership laws, where the new law was not complied

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 258 U. S. —, 43 Sup. Ct. —, 67 L. Ed. —.

with either as to form of the certificate or place of filing, and the business to be carried on was one prohibited to limited partnerships by the new law.

3. **Partnership ⬢362—Provision of uniform law relieving persons erroneously believing themselves to be special partners applicable, though limited partnership created for prohibited business.**

Uniform Limited Partnership Act of Illinois, § 11, providing that a person contributing to the capital of a business, erroneously believing that he has become a limited partner, is not a general partner, if on ascertaining his mistake he promptly renounces his interest in the profits, applies, though the partnership was created to carry on a brokerage business, which under such act limited partnerships cannot carry on.

4. **Partnership ⬢362—Provision of uniform law relieving persons erroneously believing themselves special partners applicable, though renunciation not made until bankruptcy.**

Uniform Limited Partnership Act of Illinois, § 11, providing that one contributing to the capital of a business, erroneously believing himself a limited partner, is not a general partner, if on ascertaining the mistake he renounces his interest in the profits, applied, though such renunciation was not made until the partnership's bankruptcy, where the erroneous belief had continued until within a reasonable time before the renunciation.

5. **Partnership ⬢362—Provision of uniform law relieving persons erroneously believing themselves special partners held to protect others making contributions under trust agreement, though they did not so believe.**

Where persons erroneously believing themselves special partners in a limited partnership made contributions to the capital received by them from others under trust agreement, and on learning that the partnership was not a valid limited partnership restored everything received by way of interest or profits on all of the contributions, the other parties to the trust agreement were protected from liability as general partners by Uniform Limited Partnership Act of Illinois, § 11, though they did not erroneously believe themselves to be limited partners, but denied that they were partners at all.

6. **Partnership ⬢352—Persons making contributions to capital held not general partners as to third persons, when not so intended, whether protected by Limited Partnership Act or not.**

Under Uniform Partnership Act of Illinois, §§ 4, 6, 7, 9, persons making contributions to the capital of a partnership, and who under the partnership agreement had no participation in the conduct of business, could not bind the firm, and were not liable for losses, were not general partners with the other members of the firm as between themselves, and hence were not such as to third person, whether or not protected from liability as such by Uniform Limited Partnership Act, § 11.

7. **Partnership ⬢352—Provision of uniform law that persons not partners as between themselves not partners as to others applies to all partnerships.**

Uniform Partnership Act of Illinois, § 7 (1), providing that, except as otherwise provided, persons not partners as to each other are not partners as to third persons, applies to partnerships for the carrying on of a business prohibited to limited partnerships, and regardless of whether the parties were acting under the belief that they had created a limited partnership or not.

8. **Statutes ⬢226—Uniform statutes should be recognized, to exclusion of inconsistent doctrines previously obtaining.**

Statutes designed to be uniformly adopted by the different states, such as the Uniform Partnership Act and the Uniform Limited Partnership Act of Illinois, should have recognition to the exclusion of any inconsistent doctrine previously obtaining in any of the states enacting them.

Evans, Circuit Judge, dissenting.

---

⬢For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Petition to Review and Revise Order of the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Bankruptcy proceeding against Marcuse & Co., alleged bankrupts, on petition of C. B. Giles and others. An order found that Henry Vette and others were general partners of the firm, and they petition to review and revise the same. Order revised.

Petitioners seek review and revision of an order of the District Court of July 1, 1920, finding in effect that petitioners and Hecht, Finn, Marcuse and Morris were general partners of the firm of Marcuse & Co., against which original and supplemental petitions in bankruptcy had theretofore been filed, alleging all to be general partners, and referring the petition to a referee to ascertain the solvency of all of them as "composing the firm of Marcuse & Co." After filing of the petition to review and revise, Hecht and Finn, though not petitioners, joined in the petition and asked review and revision of the order. They will, with the others, be considered and referred to as petitioners; Hecht, since deceased, appearing by his executor.

The record discloses that under date of April 2, 1917, all the alleged partners, except the Studebakers (one Hoffman signing in his own name, but in fact as representing the Studebaker interest), executed an agreement which provided for carrying on at Chicago a brokerage business of buying and selling on commission stocks, bonds, grains, etc., for a period of five years from such date, under firm name of Marcuse & Co.; that such firm be a limited partnership under the statute of Illinois, Marcuse and Morris the general partners, and the others special partners, the contributions of the latter to be, Hecht $25,000, Hoffman $50,000, Vette $30,000, Zuncker $25,000, Finn $31,500, and Regensteiner $28,500, total $190,000; that the business be conducted and managed by Marcuse and Morris, they to receive named salaries, and that on the contributions of Marcuse, Morris, and of the special partners should be paid interest at 6 per cent. per annum; that thereafter 25 per cent. of the net profits be paid to Marcuse, to be applied by him on certain certificates which he would issue, representing debts due from Von Frantzius & Co. (then in bankruptcy), all of such limited partners, except Vette and Zuncker, being large creditors of the Von Frantzius concern, and that after such certificates are paid, the said 25 per cent. should be paid to all the parties to the agreement, except Morris: that 10 per cent. of the net profits of the business was payable to Morris, and the balance of profits was to be divided periodically between the parties in proportion to their contributions to the whole capital; that the special partners be limited in their liability to the amounts respectively contributed to the capital, and that they should have no liability for debts of the partnership beyond such contributions; that Marcuse and Morris should be in charge of and carry on the business, and that the special partners shall have right to examine the books and have them audited, and in certain contingencies to have the business liquidated. After execution of the agreements they were left with one of the lawyers, pending carrying out of certain conditions, mainly the dismissal of the Von Frantzius bankruptcy proceedings, with which concern Marcuse had been in some way connected.

One of the contributions of Marcuse toward the firm's capital was a seat on the New York Stock Exchange estimated to be then worth $68,000. When in New York, shortly after the agreement was signed, Marcuse learned that under the practice of the New York Stock Exchange firms doing business there were not permitted to have more than two special partners who must not be engaged in any other business. Marcuse at once notified his attorney at Chicago and after further negotiation between the parties concerned or their representatives, another agreement was signed June 30, 1917 (but dated April 2, 1917), wherein the general partners were stated to be Marcuse and Morris, and the special partners Hecht and Finn. The stated objects of the partnership, the name, and the details respecting rights, duties and immunities of the parties and the character and amount of capital contributions were in all essential features the same as under the first contract except that Hecht and Finn, the special partners, each agreed to contribute $95,000, and the term was

five years from July 1, 1917. At the same time there was executed by Hecht and Finn an instrument under date of June 30, 1917, known as the "Hecht-Finn Trust," in which Hecht and Finn were named as trustees, wherein, after reciting the last-named partnership agreement as being attached as an exhibit, and that Hecht and Finn held in trust all interest in the assets and income coming to them under said partnership agreement, it is provided that the trustees shall direct that any distribution to be made to them by the partnership under the terms of the partnership agreement be paid over by the partnership to the Chicago Title & Trust Company on account of the "Hecht-Finn Trust," to be by the Chicago Title & Trust Company distributed among the holders of trust certificates under the Hecht-Finn Trust. It was provided that these trust certificates should be issued by the Chicago Title & Trust Company to evidence 380 shares, each of $500, and that the interest represented should be subject to the terms and conditions of the Hecht-Finn Trust; that the certificates were transferable only upon the books of the Chicago Title & Trust Company, and that the original certificate holders and holdings should be, Hecht 50, Finn 63, Hoffman 100, Regensteiner 57, Vette 60, and Zuncker 50, a total of 380, or $190,000. It was agreed that the profits earned by the partnership should be drawn out at least twice a year, and the Hecht-Finn share be paid by the partnership to the Chicago Title & Trust Company, and by it ratably distributed among the registered holders of the certificates. It was provided that in certain contingencies the certificate holders might name an auditor to audit the accounts of the firm, and that, in the case of the death of Hecht and Finn, certificate holders might choose another to be the special partner in the concern.

The trust instrument was by indorsement thereon assented to by the Chicago Title & Trust Company and by Marcuse and Morris, who agreed to do all the things therein provided to be done by the partnership. On June 30 the parties met and delivered their respective checks for the amount of their several contributions (representing in each case the amount of the Hecht-Finn Trust certificate holding) ; the checks of the certificate holders being made to Hecht and Finn who indorsed them to the firm. The check of the Studebaker interest was one of the Studebaker Bros. Trust to Hoffman, who indorsed it to Hecht and Finn as trustees; they in turn indorsing it to Marcuse & Co. Some days later the trust certificates, dated June 30, were issued in the amounts and to the persons as stated; the Studebaker certificate being issued to Hoffman, who at once indorsed it over to Mr. Gardner, secretary of the Chicago Title & Trust Company, for the Studebaker Bros. Trust. A certificate of limited partnership, drawn in accordance with the then limited partnership law of Illinois, was duly executed. It was dated April 2, signed by Marcuse, Morris, Hecht, and Finn, recited contribution of $95,000 each by Hecht and Finn, and that the partnership was to commence July 1, 1917, and terminate June 30, 1922. Acknowledgment and oath were dated June 30. The first partnership contracts were never delivered, and it was testified that some time in July they were canceled by tearing off the signatures thereon.

June 30, 1917, was Saturday, and, the banks and county offices closing at noon, the transaction could not be completed that day. The following Monday, July 2, the certificate of limited partnership was filed in the office of the county clerk of Cook county, and the checks were all deposited to the credit of the firm, excepting that of Hecht. As to this Hecht had requested Marcuse to withhold temporarily deposit of it, and it was not deposited until about the end of July. It appears that Hecht's bank account was during all that month prior to the deposit of his check, much smaller than the amount of this check. His banker testified that, had the check been deposited at any time, it would have been paid, regardless of his balance. The supposed limited partnership of Marcuse & Co. began to transact business July 2, 1917 (although for some time theretofore Marcuse and Morris had been carrying on the brokerage business under the same name at the same location), and continued in business until the filing of the petition in bankruptcy in March, 1920.

The "Studebaker Bros. Trust" was made in 1916 between petitioners George M. and Clement Studebaker, "grantors," the Chicago Title & Trust Company, "trustee," and Scott Brown, "manager." It recites that the grantors had delivered to the trustee certain moneys and properties of value as stated in the

schedules, and contemplated the delivery of other money and property owned by the grantors, and that the grantors are desirous of creating such money and property into a trust fund to be employed and operated for the use of the grantors; that the corpus of the trust fund shall be ultimately divided between the grantors in proportion to their contributions thereto. It sells, assigns, and transfers to the trustee all such moneys and properties, to be held by the trustee under the enumerated terms of the trust. Brown was to be manager, in charge of the office, and to keep books of account, and with the grantors constituted the first board of directors. The directors had power to direct the policy of the trust, and the investment of the trust funds, and Brown was subject to removal as director by the other two. He was to receive a salary, and had a contingent interest in the profits of the trust. The grantors were to be beneficially interested in the trust fund and its income and profits in proportion to their contribution.

On July 1, 1917, there became effective in Illinois the Uniform General and Special Partnership statutes (Hurd's Rev. St. Ill. 1921, c. 106a, §§ 1–75). The latter made radical changes in the law of Illinois regarding limited partnerships, in the matter of their formation and manner of manifesting same, and provided, inter alia, that thenceforth there shall be no special or limited partnerships formed in the state of Illinois for carrying on brokerage business. It repealed the prior statute on limited partnerships. Shortly after it appeared in the bankruptcy proceedings that it was contended on behalf of creditors of the firm that no limited partnership was in fact effected, and that all the petitioners herein became under the law general partners with Marcuse and Morris, Hecht and Finn unconditionally tendered and paid into court $46,000 for the alleged bankrupt estate by way of interest and profit paid out by the firm to the investors of the entire $190,000 since the organization of the firm, including interest thereon from time of payment; such payment being made on the theory that thereby they were relieved from general partnership liability by virtue of section 11 of the Uniform Limited Partnership Act (chapter 106a, § 55). The uncontradicted evidence is that the amount thus paid was sufficient to cover these items. The payment, although of an amount equal to what was thus received by all the certificate holders, was made by Hecht and Finn without the consent or approval of the others, and without contribution on their part thereto.

Apart from the documentary evidence, there was oral evidence tending to show that the first limited partnership contract was completely abandoned, and that thereafter the Studebakers and Vette and Zuncker absolutely declined to enter into any limited partnership whatever, and that the final contract, including he Hecht-Finn Trust, was in good faith what it purported to be, and to no extent a device for carrying out the plan of the first contract, and circumvent the rule of the New York Stock Exchange respecting limited partners. Other oral evidence tended to establish such intended circumvention as the real purpose of the later papers, and that the true intent of all the parties was to carry out the terms of the limited partnership contract as it was first proposed.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

Harry P. Weber, George W. Miller, George T. Buckingham, Donald Defrees, and Stephen E. Hurley, all of Chicago, Ill., for petitioners.

Henry H. Kennedy, Julius Moses, Hamilton Moses, S. Sidney Stein, Walter Bachrach, Lewis F. Jacobson, Jacob Ringer, and Michael Gesas, all of Chicago, Ill., for respondents.

ALSCHULER, Circuit Judge (after stating the facts as above). The primary issue is whether, under above-stated facts, petitioners are liable as general partners with Marcuse and Morris. Then there is the question whether, in case Hecht and Finn are so liable, the liability can be extended also to the other petitioners, who do not by the finally executed contract purport to have entered into any partnership arrangement of any sort, and the further question whether the Studebakers can in any event be held general partners, in view of the

fact that the Studebaker contribution was made by and for "Studebaker Bros. Trust." The various contentions will be stated as they are below considered.

[1] For respondents it is strongly urged that the reduction of the first agreed number of special partners from 5 to 2, and the "Hecht-Finn Trust," with certificates to manifest the interest of each contributor, was a fraud and a device conceived for the purpose of avoiding the objection of the New York Stock Exchange to limited partnerships having more than 2 special partners, and to any special partners being engaged in other business. There was evidence from which the District Court could have reached this conclusion, and doubtless it did so conclude, and such conclusion of fact, reached upon contradictory evidence, we may not disturb in this proceeding to review and revise as to the law. But would such finding warrant the conclusion that the ostensible limited partners and the certificate holders all became general partners with Marcuse and Morris? Applying to the transaction the epithet of fraud does not change its true nature or its incidents. If it had been intended that all should be general partners, and the device was for the purpose of concealment, and protection of some from general liability, the court would look through the form to the actual intent and purpose of the parties. But the record affords not even suggestion of such intent. If the contribution of $190,-000 was in good faith made to the capital of the partnership, it is not readily understandable what material difference it would make whether it was in fact contributed by 2 or by 20.

It does not appear that by such device to avoid the Stock Exchange ruling, the creditors of the partnership were in any degree defrauded or periled. If the New York Stock Exchange is a creditor, and has been to its detriment misled through the alleged fraudulent device, its rights and remedies against those who participated therein remain unaffected by the bankruptcy. But in the entire absence of any showing of detriment occasioned thereby to the creditors generally, or in fact to any of them, the utmost that could be visited upon the participants of this deception would be to hold that they occupy toward this partnership and its creditors the same relation as do Hecht and Finn, viz. that of such who from July 1, 1917, erroneously believed and assumed that they then entered upon a limited partnership. Assuming, therefore, that the transactions of June 30 and July 2 were colorable, in that, while a limited partnership was intended as to all the petitioners, it was carried out in form to deceive the New York Stock Exchange as to the number of its special partners, this deception would not of itself serve to fasten on the deceivers the liability of general partners. Respondents urged that in this statement of the contributors as set forth in the filed certificate there was such falsity as under the old Illinois act would result in all becoming general partners, notwithstanding the stated total was in fact contributed. Under the rigors of the old law this might have been so, but the contention of unlimited liability rests mainly on the nonapplicability of the old statute, through failure to complete the organization and begin business thereunder, and file the limited partnership certificate until

after the repeal of the act requiring it, and the resultant nonapplicability of the old statute.

It is apparent that none of the parties to the contract or the certificate holders under the Hecht-Finn Trust contemplated or supposed that general partnership liability was assumed by any of them except Marcuse and Morris, and it was the evident understanding and belief of all that the others, whether called special partners or certificate holders, would have no liability beyond their investment, and no participation in the conduct and control of the business, which was by the agreement committed wholly to Marcuse and Morris. Had the limited partnership been fully perfected while the act of 1874 (Rev. St. 1874, c. 84) was yet in force, these investors would probably have incurred no liability beyond their investment. At any rate, this was their intention, regardless of whether under the circumstances under that law this would have been the result.

If under the old law the certificate or affidavit filed was materially false, the statutory result was to make all liable as general partners. Many other states had or have similar statutory provisions, and the courts have quite generally construed such provisions strictly against the limited partners. To such extent was this tendency recognized in the mercantile world that it was considered hazardous for one to invest money in a partnership enterprise upon the faith of compliance with limited partnership statutes, which were quite commonly regarded as a trap to catch the unwary rather than a proper means to a desirable end. To relieve from such undue hazard, and make more safe to investors not participating in the business, the employment of their capital in partnership enterprises, as well as to bring about uniformity in such matters, the "Uniform Limited Partnership Act" was drafted and submitted to the Legislatures of the different states. Several of the states have adopted it. It passed the Illinois Legislature as drafted, in June, 1917, and became a law without the Governor's signature June 28, effective three days afterwards, July 1, repealing the act of 1874.

It indicates a policy with respect to this subject quite the reverse of that of its predecessor. While section 8 of the old act provided that the limited partnership shall not be deemed formed until the certificate as specified has been filed, and that any false statement in the certificate required to be signed by all the parties, or in the affidavit required to be signed by one of them, shall result in all the persons being general partners, the provisions of the Uniform Limited Partnership Act as to such matters are significantly otherwise. Section 2 (chapter 106a, § 46) provides that the limited partnership is formed when there has been substantial compliance in good faith with the requirements of the law, and as to false statements section 6 (chapter 106a, § 50) provides, not that thereby general partnership results as to all, but only as to those who executed the certificate knowing it to be false, and in favor of those only who suffer loss through reliance thereon. Provision is made for admitting other limited partners, and for the assignment of limited partnership interests, and for the limited partner to loan money to and transact business with the partner-

ship as an outsider might do, and for one to be at the same time a limited and a general partner. Section 24 (chapter 106a, § 68) provides for amendment of the certificate when there is a false or erroneous statement therein, or when the members desire to make in it any change that shall accurately represent the agreement between them. To insure construction as of remedial legislation, section 28 (chapter 106a, § 72) provides that the rule of strict construction of statutes in derogation of the common law shall not apply to the act. Section 11 (chapter 106a, § 55) provides that—

"A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with a person or in a partnership carrying on the business, or bound by the obligations of such person or partnership: Provided that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income."

[2] Although on July 2, 1917, when this supposed limited partnership deal was supposedly consummated through delivery of the executed agreements, filing of certificate, deposit of checks, and beginning of the business, and from that time to the time of the bankruptcy all the parties were under the belief that they were a limited partnership duly organized under the law of Illinois, it appears that in this they were clearly mistaken, because the law under which they attempted so to qualify had been repealed before their organization was completed, certificate filed, and business begun, and they did not comply with the new act, either in the form of the certificate or in the filing of it for record in the recorder's office as required under the new law, the filing having been in the office of the county clerk as the old law prescribed, and also because the new law provides that limited partnerships shall not be organized for the carrying on of brokerage business.

[3] As set forth in the statement of facts the record shows that after the filing of the intervening petition charging that all were general partners, Hecht and Finn undertook to avail themselves of the provisions of section 11 by unconditionally paying into court for the alleged bankrupt estate $46,000 which represents the profits and income which, during the course of the business, had been paid on this $190,000 of capital, with interest from time of payment, and it is the contention that this payment operates to relieve from general partnership liability the theretofore supposed special partners, including all the certificate holders under the Hecht-Finn trust.

It is earnestly contended that because the Uniform Limited Partnership Act prohibits the formation of a limited partnership to carry on the business of brokerage, section 11 cannot in any event afford relief. But section 11 is very broad in its terms. It is not limited to instances where there has been an attempted compliance with the provisions of the new act. It includes in its terms any person who at any time contributed to a partnership, erroneously believing himself to be a limited partner.

There are other sections which amply provide for the correction of errors and irregularities in organization and for amendment of statements in accordance with the facts, thereby perfecting and confirming the special partnership, without incurrence of general liability. This section is not designed to amend or correct or perfect the limited partnership organization, so that it may thereafter continue as such, but looks rather to the termination of the relation, and relief from general liability on compliance with the terms of the section in all those cases where persons erroneously believed they had become limited partners, without regard to whether or not the belief was induced by supposed compliance with this or any other act. This view not only comports with the words of the section, but with the evident general purpose of the act to give effect, so far as may be done, to the bona fide intent of parties, and to relieve from the extreme consequences of honest mistakes, which the prior law and its strict interpretation entailed. The erroneous belief may be as to the nature of the business which may be organized into a limited partnership as well as to any other matter of law or of fact, which induced the error. In this respect we do not conceive section 11 to be different in its effect as part of the new law than if it had been adopted as an amendment to the old.

[4] It is further contended that section 11 does not contemplate one may wait for two or three years, and until bankruptcy overtakes the concern, before undertaking to have the benefit of the section. Such state of facts would go only to an issue upon the good faith of the asserted erroneous belief, and the prompt renunciation of interest in the profits and income of the business, after learning of the error. One can scarcely imagine circumstances under which error might have been more readily induced than those which this record presents. The new law had manifestly not then been published, and the three days which intervened between the time it became law and the time it became effective hardly gave opportunity for public discussion thereon. After the business started it does not appear that there was occasion for investigation as to its organization, nor that this was challenged, until about the time the concern got into difficulty. Even the New York Stock Exchange does not appear to have questioned its validity as a limited partnership. Consideration of the very exceptional circumstances shown induce quite inevitably the conclusion that, during all the time this business was carried on, it was in the honest, though erroneous, belief of all connected with it that it was a limited partnership, and that within reasonable promptness after ascertainment of the true status it was undertaken to comply with the conditions imposed by section 11, albeit this was after petition in bankruptcy was filed.

In the statutory condition that "he promptly renounces his interest in the profits of the business or other compensation by way of income" there may be some ambiguity; but in this case the record shows the compliance was to the fullest extent that might be claimed on behalf of creditors, and it is not contended that the unconditional payment of the $46,000 falls short of compliance with the section, if the

section has application. The fact that elsewhere in the act amendment, correction, and perfection of the organization are adequately provided for assists to the conclusion that section 11 contemplated situations where a limited partnership could not under the law be formed at all, or where, because of intervening conditions, it would not be practicable to perfect or continue it.

[5] But it is urged that in no event can Vette, Zuncker, Regensteiner, and the Studebakers have advantage of section 11, because of their denial that they ever became limited partners, and their consequent want of belief that they were such. The relief afforded by the section is to a person "erroneously believing that he has become a limited partner in a limited partnership." The insistence is, and the court evidently so found, that Hecht and Finn, although appearing as the only special partners, were in truth and in fact representing as well the other petitioners herein, whose relation to the partnership was found to be not different from that of Hecht and Finn. Their connection with the partnership being thus traced through their representation by Hecht and Finn, it follows that, if such representation would operate to charge them, they should in good conscience also have the benefit of whatever Hecht and Finn may have done which would bring relief from the charge. If, therefore, it appears that Hecht and Finn believed themselves to be special partners (and there can be no doubt that they did so believe), their representative capacity held to exist as to a part of the contributed capital would extend and inure to those whom they are thus held to have represented. The restitution having been made on the entire $190,000 of supposed special partnership contributions, and having been of an amount sufficient for compliance with section 11 by all the petitioners, part of them should not be denied its benefit, because of their insistence that they were not members of any partnership at all, limited or general. Limited liability is the dominating feature of a limited partnership, and petitioners, other than Hecht and Finn, resting as they did under the belief that they had effectually contracted for limited liability, it is our view that, if section 11 applies at all, the fact that their real purpose was shown to have been the formation of a limited partnership will not deprive them of the benefit of section 11, if the compliance with its terms included in fact all the petitioners, assuming, as we do, that the record fails to show credit was extended to the firm on the faith that petitioners were general partners.

[6] Petitioners insist that, apart from other contentions, under the record here they are protected from a general partnership liability by the provisions of the Uniform Partnership Act adopted in Illinois passed at the same time and in the same manner as the Uniform Limited Partnership Act, and likewise effective July 1, 1917. Let it be assumed that section 11 of the Limited Partnership Act has no application whatever to partnerships carrying on brokerage business, and that persons erroneously believing themselves to be limited partners in such business cannot in any event be relieved from general liability by compliance with section 11: The rights and liabilities of such persons must then be tested by and under the law governing general part-

nerships, which in Illinois, from and after July 1, 1917, was the Uniform Partnership statute.

This act, conceived and born with the Uniform Limited Partnership Act, indicates similar purpose of relieving from · risk of incurring partnership liability where the general partnership relation was not by the parties intended. It prescribes that the rule of strict construction of statutes in derogation of common law shall have no application to the act (section 4 [1]), and defines a partnership to be "an association of two or more persons to carry on as co-owners a business for profit" (section 6 [1]). The contractual relation of petitioners does not fall within this definition. It cannot strictly be said that they became co-owners. They contributed $190,000, which, unless lost in the venture, would eventually be returned to them. In this respect it differed from a loan of funds to the partnership, with division of profits in compensation for the loan, only to the extent that in the one case the creditors of the partnership may resort to the amount so contributed, free from participation of any claim of the contributor as a creditor, while the loaner would for his loan be upon parity with other creditors. Petitioners had no proprietary interest in, or title to, or dominion over, the property of the partnership; neither had they under the contractual relation any right, power, or duty in the carrying on of the partnership business. As to the conduct of the business they were strangers, in quite the same sense that a loaner of funds would have been.

While receipt of profits has in some instances been held conclusively to presume partnership as to creditors, section 7 (4) makes this presumption prima facie only. Section 9 (1) provides that every partner is the agent of the partnership for the purposes of the business. But under this contract none of petitioners had or could have had any right to do a single act whereby the partnership would have been bound. The contract, either as first drawn or as afterwards entered into, gave them no right or power to act for the partnership, and the record does not disclose any holding out or assumption of agency. Section 7, under the subtitle "Tests in Determining the Existence of a Partnership," prescribes that:

"In determining whether a partnership exists, these rules shall apply: (1) Except as provided by section 16, persons who are not partners as to each other are not partners as to third persons."

Under the law as it was prior to the adoption of the Uniform Partnership Act the existence of general partnership as between alleged partners was a question wholly of their intention, to be gathered from their agreement. Goacher v. Bates, 280 Ill. 372, 117 N. E. 427; National Surety Co. v. Townsend Brick, etc., Co., 176 Ill. 156, 52 N. E. 938. In the last cited case it was said:

"While the agreement with Adams Bros. to share one-half the profits and losses might raise a presumption of partnership, yet if the parties actually meant that there was to be no partnership created, and so contracted, the presumption would be rebutted."

In Grinton v. Strong et al., 148 Ill. 587, 36 N. E. 559, the court said:

"Even where parties * * * enter into a joint enterprise and share in the profits, a partnership, as between themselves, is not necessarily the result. The intention of the parties always controls."

So in Smith v. Knight et al., 71 Ill. 148, 22 Am. Rep. 94, where Knight agreed to put money into a commission business and was to receive 10 per cent. per annum and the share of the commissions, but was not to be liable for losses, the court, passing on the alleged partnership of Knight, said:

"In determining this question, the intention of the parties must be considered. Written articles of copartnership may be so expressive as to leave no room for doubt. So far as these articles of agreement are concerned, we discover nothing in them evidencing an intention to form a partnership."

And in Insurance Co. v. Barringer, 73 Ill. 230, the court said:

"Whether a partnership exists or not, depends upon the intention of the parties. Parties may be partners as to third persons, when not so between themselves."

In London Assurance Co. v. Drennen, 116 U. S. 461, 6 Sup. Ct. 442, 29 L. Ed. 688, it was said: .

"The mere participation in profits would give no such [partnership] interest contrary to the real intention of the parties. Persons cannot be made to assume the relation of partners, as between themselves, when their purpose is that no partnership shall exist."

If we are correct in saying that, as between Marcuse and Morris on the one hand and the petitioners on the other, it was the distinct intent and purpose that there should be no general partnership, then as between themselves they did not become general partners. Undoubtedly contracts are conceivable wherein the parties may call themselves partners, where from the things actually agreed upon the partnership relation does not exist; and, on the other hand, they may in terms declare they are not partners, when the very things they have agreed upon supply all the elements of partnership, and they would become partners despite their declaration to the contrary.

By the terms of this contract petitioners were to have no participation in the conduct of the business, could not in any manner contract for or bind the firm, and were not to be liable for losses beyond their several contributions to its capital. The existence of a partnership between themselves may be tested by the query whether in case of loss of the entire capital of the concern, and payment by Marcuse and Morris of its debts, they might have contribution from petitioners as in partnership. Undoubtedly under the contractual relation here shown they could not. We conclude that in any event, as between themselves, petitioners were not general partners with Marcuse and Morris.

[7] If section 7 (1) means what it says, then this alleged general partnership does not respond to the prescribed statutory test that "persons who are not partners as to each other are not partners as to third persons." The section is all-inclusive and has application to

alleged partnerships of all kinds, whether for the carrying on of brokerage or any other business, and wholly regardless of whether the parties were or were not acting under the belief that they had created a limited partnership. The act manifests a definite purpose of making paramount the contractual intent of the parties to the agreement, as a test for fixing a general partnership liability rather than, as often theretofore, by way of penalization for participation in profits, or doing other things which held parties to general partnership liability, when general partnership was not contemplated or intended, and was not in fact effected as between themselves.

With the wisdom of such change in policy as is manifested by the Uniform Partnership Acts we are not of necessity here concerned. There is reason for each view; but we are not at liberty to reject the test which the statute fixes. If experience shows the statutory test to be impractical and unwise, the remedy is with the Legislature alone. The record discloses no such situation as would suggest that the application here of that test involves hardship or inequity toward the creditors generally. It shows nothing to indicate that creditors were beguiled into extending credit to the firm on the faith that the petitioners (particularly the others than Hecht and Finn) were general partners, nor that petitioners held themselves out as such partners, or did any other of those things which, under section 16 of the act, might entail upon them general partnership liability.

We conclude that petitioners, not having assumed general partnership relation with Marcuse and Morris, did not as to others become partners with them.

[8] We find no reported decisions construing the statutory provision above considered. A salutary principle of construction of statutes designed to be uniformly adopted by the states is found in Commercial Bank v. Canal Bank, 239 U. S. 520, 36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25, where the Uniform Warehouse Receipts Act was under consideration, and the court said it "should have recognition to the exclusion of any inconsistent doctrine which may have previously obtained in any of the states enacting it."

While these proceedings will in no wise interfere with any creditor of the alleged bankrupt undertaking to establish elsewhere or otherwise liability to him of any or all of petitioners by virtue of section 16 of the Uniform Partnership Act, we find that, resolving in favor of respondent all disputed questions of fact, the law as applied to the record here does not warrant the inclusion of petitioners in the order of reference on the question of solvency of Marcuse & Co. This conclusion makes it unnecessary to consider the proposition that the Studebaker interest in the concern belonged wholly to Studebaker Bros. Trust, and not to the Studebakers as individuals, and that therefore they can in no event be held liable as partners.

The order here under review is revised, by eliminating therefrom the names of all the petitioners herein, leaving the revised order to include Marcuse and Morris only as the general partners in the alleged bankrupt firm of Marcuse & Company. Petitioners are adjudged their costs.

EVAN A. EVANS, Circuit Judge (dissenting). In view of the large sums involved, I feel justified in setting forth somewhat fully my reasons for this dissent.

The District Judge, after hearing the evidence, found that petitioners were general partners of the firm of Marcuse & Co., against whom a petition in bankruptcy had been filed. The order of reference thereupon made to determine the solvency of the partnership as enlarged, petitioners now seek to review and revise. Only questions of law are therefore presented. In re Hoyne, Bankrupt (C. C. A.) 277 Fed. 668. On this record we can consider but one question: Is there any evidence to support the conclusion of the District Judge?

The District Judge failed to make specific findings of fact, but we must assume that such findings as were essential or might be necessary to support his conclusions were by him found in favor of respondents. His conclusion that petitioners were general partners makes such a position unavoidable.

Respondents urge that there was oral evidence tending to show that the written agreement of the parties was but a cover to the real understanding; that, in order to prevent the enforcement of the liability arising out of a general partnership, the parties executed a written agreement which on its face purported to be a limited partnership. Finding that such a partnership could not transact business on the New York Stock Exchange, a new agreement was executed. for the purpose of deceiving the New York Stock Exchange, and with the further object of preventing any detection of the real status of the parties in case an enforcement of the partnership liability was later attempted by any creditor of the firm. If there is any evidence in the record to support the position of the respondents, we must accept it as established. In re Hoyne, Bankrupt, supra. Nor are respondents limited upon this inquiry to direct evidence. Their position may find support in the inferences fairly deducible from the established facts.

Respondents, however, do not rely solely upon this contention, but assert in addition that, should we conclude, in executing the agreement under consideration, the parties intended the formation of a limited partnership only, nevertheless petitioners occupy the status of general partners in the partnership, because limited partnerships to conduct a brokerage business were not authorized in the state of Illinois. My reasons for dissenting will be confined to this contention only. Briefly it may be said that the parties to this agreement on July 2, 1917, and continuously thereafter to a date subsequent to these bankruptcy proceedings, associated themselves together for the conduct of a brokerage business, wherein each party contributed toward the common capital, and wherein the profits were divided according to the contribution. The status of the parties to the contract, then, must necessarily have been that of (a) limited partners; (b) general partners; or (c) creditors.

By a process of elimination we can readily exclude any finding that petitioners were creditors. All of the evidence points to the denial of the relationship of debtor and creditor. It is not urged in this court, except inferentially. The parties never intended to create such a re-

lationship. The definite period during which the agreement was to remain in force, viz. five years, tends to disprove such a status. In the agreement we find the parties provide:

"The said parties above named have agreed to become co-partners in business and by these presents agree to be partners to one another under the name and style of Marcuse & Co."

Also:

"The net profits of said business shall be divided among the partners thereto in manner as follows: * * * All the balance of said net profits of said business shall be divided among all of the parties hereto, except the said Morris, in the proportions in which they have contributed to the capital or capital stock of said firm."

The so-called trust agreement executed by Hecht and Finn recognizes the relation of the petitioners to Marcuse and Morris as being that of partners by saying:

"Whereas, under the terms and provisions of said articles of agreement, reference to which is hereby made, the undersigned, said Frank A. Hecht and said Joseph M. Finn, by reason of their relation to said firm as special partners, are, and will from time to time become, entitled to certain payments and distributions of the copartnership assets and the income, interest, and profits of and upon said assets."

In the partnership agreement the so-called special partners were authorized to name auditors of the business of said copartnership, who were authorized to examine the books and might certify in writing that the business was not being conducted in a "safe, conservative, and judicious manner," or that the general partners were "not properly managing the business," in which case a dissolution of the partnership was authorized at the option of the special partners. The control of the business by the so-called special partners is indicative of a partnership and the provision for the dissolution of the firm confirms the conclusion that petitioners were not simply creditors.

The case is quite unlike the case of In re Hoyne, Bankrupt, recently decided by this court, where the parties designated themselves and treated themselves as debtors and creditors. The oral testimony of certain witnesses likewise recognized all of the parties as partners and nothing else. A finding that petitioners were not creditors, which the court necessarily made when it found them partners, must then not only be accepted on this petition to review and revise, but, it may be added, was the only finding that could be fairly reached from this record. Not being creditors, the parties were either members of a limited partnership or members of a general partnership.

The law of Illinois, where the contract was executed and where the business of the partnership was to be conducted, must define petitioners' status. The Uniform Partnership Act covers both limited and general partnerships and was in force at the time this contract went into effect. It is idle to discuss the history of the passage of this act. Whether it received the Governor's signature or became effective by operation of law, whether it had long been in effect or not, are questions apart and disassociated from the question of construction. The Uniform Partnership Act represents the law of partnership,

and so far as applicable must govern the contract of the parties. In passing, it might be observed that, but for the existence of the Uniform Partnership Act, the contention that petitioners were general partners because of the authority of the special partners and the provision for control of the business through the auditors might be quite as potent as the argument respondents now urge.

The parties' rights and their liabilities are fixed by the terms of the Uniform Partnership Act, however, and our inquiry must be directed to the effect of the act upon the agreement, and this in turn becomes a question of statutory construction. Unquestionably it was the intention of the Legislature to enlarge the usefulness of the limited partnership as an instrument in the conduct of business. To accomplish this intention, then, courts should give the act a liberal construction.

It is equally certain that, because of the danger of great loss through its use in certain fields of industry, the Legislature denied its use to those who wished to engage in the banking, insurance, railroad, or brokerage business. This manifest intent, clearly expressed in section 3, must likewise find expression in the construction of the statute. There is no authority to conduct business under the Uniform Limited Partnership Act, except for the legitimate purposes therein described. Section 3 (chapter 106a, § 47) reads:

"A limited partnership may carry on any business which a partnership without limited partners may carry on, except banking, insurance, brokerage and the operation of railroads."

It is not necessary to inquire into the reasons for excepting these four businesses; but, if ground for the exception in section 3 be required, neither imagination nor speculation need be awakened to suggest the motive and the purpose back of the legislation. The facts in the present case furnish a most persuasive argument in favor of the wisdom of the legislation that denied to those who would engage in the banking, the insurance, the railroad, or the brokerage business the right to do so through a limited partnership. Notwithstanding the express language of the exception in this section, the construction and the effect of which are not open to question, a conclusion has been reached that sanctions and gives legality to a course of dealing the authority for which is expressly denied.

But petitioners seek to avoid the effect of section 3 by referring to section 11 of the act, which reads:

"A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership: Provided that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income."

Passing for the moment the two issues raised by respondents in reference to this section, denial of any renunciation by certain of the petitioners and failure of all of them to renounce during the life of the partnership, and taking up at once the construction and effect of this section 11, it is apparent that we are confronted with a question of

statutory construction, concerning which the rules applicable are well recognized. For example, the entire act must be read, and effect given to each section, if possible. If full effect cannot be given to the language of each section, then the overlapping sections must be read together and reconciled.

The Limited Partnership Act is readily analyzed. By its first section the term "limited partnership" is defined. Section 2 provides the steps which must be taken by any two or more persons desirous of forming a limited partnership. Section 3 defines the businesses which may be carried on by limited partnerships. The other sections deal with the rights and liabilities and powers of partners who organize under this act. In other words, section 11 was written with section 3 as its background. The words "limited partnership" obviously meant a partnership organized under this act, a partnership for the purpose of conducting a business authorized under this act. "Limited partnership" referred to lawful associations, not to those organized in defiance of the statute. The relief authorized by section 11 was limited to those cases where bona fide attempts to organize limited partnerships under the provisions of the act had been made.

The force of this conclusion is strengthened by sections 30 and 31 of the act (chapter 106a, §§ 74, 75). In the former section the Legislature used the heading "Existing Limited Partnerships," while in section 31 a further reference is made to "existing limited partnerships." "Limited partnerships," as distinguished from "existing limited partnerships," must refer to those organized under this act. We can hardly attribute to the Legislature an attempt to give the same term different meanings in the same act.

Again, speaking of the partnership, the Legislature in section 11 referred to "the partnership carrying on the business," etc. What business could the Legislature have referred to other than a lawful business, a business for the conduct of which a partnership could be lawfully organized? In this same section 11 we find a reference to "the rights of a limited partner." Section 10 (chapter 106a, § 54), the preceding section, is entitled "Rights of a Limited Partner." Can it be that the Legislature was at one moment referring to limited partnerships organized under and by virtue of this act, and to the rights and liabilities of limited partners as defined by this act, and was in the same sentence including limited partnerships organized in defiance of the act? Moreover, there could be no erroneous belief that the Uniform Limited Partnership Act had been complied with, for the parties were not only ignorant of the existence of the law, but in their agreement they expressly stated that they were endeavoring to organize under the law of 1874, which was expressly repealed by the later enactment.

Reference to the General Partnership Act cannot in my opinion help the petitioners. It is true that section 7 of the Partnership Act provides that "persons who are not partners as to each other are not partners as to third persons," but section 6 of the same act also provides:

"This act shall apply to limited partnerships, except in so far as the statutes relating to such partnerships are inconsistent herewith."

Section 3 of the Limited Partnership Act necessarily destroys the test applied by section 7 of the General Partnership Act in so far as it deals with those engaged in the brokerage business. A general partnership is defined by the act as "an association of two or more persons to carry on as co-owners a business for profit." Since two or more persons cannot conduct the brokerage business through a limited partnership, it follows that, when such persons engage in the brokerage business as co-owners for profit, they are necessarily general partners.

But, could I agree that section 11 applied to limited partnerships organized under these circumstances and for a purpose forbidden by the act, I would still find myself unable to agree that as to all petitioners there was a renunciation such as is required by section 6 to relieve them of the liability of general partners. To renounce means "to reject deliberately; to disown; to disavow; to disclaim." Ordinarily it involves personal action knowingly done, or, to quote from Black's Law Dictionary, "it implies an affirmative act of disclaimer or disavowal."

In the present case Hecht and Finn, after adjudication in bankruptcy and with enormous liability as general partners facing themselves and others, attempted to repay to the partnership the profits previously drawn by the petitioners. As to the petitioners other than Hecht and Finn, such repayment could not be a renunciation, unless such parties either ratified or authorized such repayment. The record shows that the petitioners other than Hecht and Finn not only failed to ratify or authorize such repayment, but when requested to do so, and prior to such tender, refused to authorize Hecht and Finn to make any such payment for them, or to be bound by the trustees' action in case such repayment was made. The evidence on this issue is clear and unequivocal; but, if it were doubtful or uncertain, we would, on this petition to review and revise, be required to assume that petitioners other than Hecht and Finn did not renounce their interest in the profits promptly after discovering they were not limited partners.

It is not necessary in this dissenting opinion to consider the status of Clement Studebaker, Jr., and George M. Studebaker. Their position is somewhat different from that of the other petitioners. Whether that difference would be sufficient to relieve them from the liability of general partners I need not discuss. Since this is a minority opinion, and since the majority of the court are of the opinion that none of the petitioners were general partners, it is not necessary to consider or discuss the evidence which furnishes the basis for the contention that these two petitioners were not general partners with Marcuse and Morris.