[No. 31148. Department Two. May 13, 1950.]

CLARK E. RATHKE, *Respondent,* v. G. I. GRIFFITH *et al.,*
*Appellants,* H. H. HUBER *et al., Defendants.*[1]

*O'Leary, Meyer & O'Leary,* for appellants.

*Mifflin & Mifflin,* for respondent.

ROBINSON, J.—This case involves two actions, consolidated
for purposes of trial, in which respondent sought and ob-
tained judgment against appellants Griffith, on account of
advances made by respondent to the partnership known as

[1]Reported in 218 P. (2d) 757.

.Midfield Packers, a frozen foods concern, in which Mr. Griffith was allegedly a general partner. The amounts of the judgments are not at issue, and the sole question raised on appeal concerns the status of Mr. Griffith in the partnership. If he was, as is asserted, a general partner, he is liable to respondent; on the other hand, he urges that he was a limited partner only, and it is conceded that, if he is correct in this contention, he may not be held responsible for the debts in question. The facts in the case are as follows:

On or about August 14, 1942, Mr. Griffith, in company with several others, executed a writing, denominated "Articles of Limited Copartnership," which provided that the parties thereto were associating under the firm name of Midfield Packers, an organization formed for the purpose of canning and otherwise processing fruits and vegetables. Therein appellant Griffith is described as a limited copartner, and his liability is fixed at one thousand dollars. On December 8, 1942, the articles were filed in the office of the Thurston county auditor. Mr. Griffith's only contribution to the partnership consisted of his assuming the indebtedness of the Midfield Packers on a certain truck. He paid this indebtedness in full, the entire payment amounting to over one thousand dollars.

In 1944, the original agreement was supplemented by another agreement allowing certain of the original parties to withdraw from the concern, and specifying that Mr. Griffith was to remain in the organization as a limited partner. This agreement was likewise filed with the Thurston county auditor on April 3, 1944. No publication of the certificate of partnership, or of the modification thereof, was ever made by the parties in accordance with the requirements of Rem. Rev. Stat., § 9969 [P.P.C. § 768-7], which statute was in force during this period.

The Midfield Packers entered into business, and, in the course of time, contracted the indebtedness which has become the subject of this action. Mr. Griffith testified that, upon learning that creditors of the partnership were claiming that he was a general partner, he immediately executed

a bill of sale by the terms of which he conveyed all of his interest in the partnership to the two individuals named as general partners in the original articles and in the later modification. This bill of sale purports to have been executed in November, 1946, and was filed in the office of the Thurston county auditor.

It would appear that, in a number of respects, the parties involved in the organization of the Midfield Packers failed to comply with the strict terms of the limited partnership statutes in force at the time. Their most significant lapse was their failure to publish the certificate of partnership, in accordance with the terms of Rem. Rev. Stat., § 9969 (in effect prior to 1945), which provided that:

"The partners shall, for four consecutive weeks immediately after the filing of the certificate of partnership, publish a copy of the same in some weekly newspaper published in the county where the principal place of business of the partnership is, or if no such paper be published therein, then in some newspaper in general circulation therein, . . . ."

The statute further provided that, until this requirement was complied with, the partnership was to be deemed general. Rem. Rev. Stat., § 9969. Neither of the parties to this action has referred us to any Washington cases interpreting this statute, but it is admitted that, in jurisdictions where similar statutes were in force, it was customary to construe them strictly and literally. In the present case, the trial court took the view that the failure of the parties to comply with this, and with certain other statutory requirements not necessary to be discussed here, had the effect of imposing liability as a general partner upon Mr. Griffith, the alleged limited or special partner. It would appear that the trial court's decision was in accord with the majority of the cases decided in other states under the old type of limited partnership laws. The question before us is whether the passage of the uniform limited partnership act in 1945 changed the situation with respect to attempted limited partnerships formed prior to its adoption. In this connec-

tion, it is pertinent to consider briefly the history of the concept of the limited partnership in the United States.

This form of association, though common on the continent of Europe since the middle ages, was unknown to the common law of England and the United States, and was originally borrowed from the civil law of France. *Clapp v. Lacey,* 35 Conn. 463; 3 Kent's Commentaries (14th ed.) 38. *Ames v. Downing,* 1 Bradford (N. Y.) 321, includes an interesting account of the historical background of the limited partnership; see, also, *Jacquin v. Buisson,* 11 Howard's Practice Reports (N. Y.) 385. From their earliest inception (in New York and Connecticut in 1822), limited partnership statutes, being in derogation of the common law, were strictly construed by most courts. *Pierce v. Bryant,* 87 Mass. 91; *Holliday v. Union Bag & Paper Co.,* 3 Colo. 342; *Richardson v. Hogg,* 38 Pa. 153. The view was commonly taken that the special or limited partner was essentially a general partner, with immunity from personal liability only on condition of full and exact compliance with the statutory requirements as to the details of formation of the association. Crane on Partnership 81, § 26, note 15. At a later date some courts began to take a more liberal view, and to hold that "substantial compliance" with the statutory terms was sufficient to free the special partner from liability. Thus, the statutes often provided that, at the time of filing the certificate of partnership, one of the general partners should file an affidavit stating that sums specified in the certificate of partnership to have been contributed by each of the special partners had actually been paid in cash; and they commonly further provided that any false statement in this affidavit would result in the alleged special partners being held liable as general partners. The earlier cases held that a statement that the payment had been made in cash when it had actually been made by check (and the check had not been presented for payment at the time of the filing of the affidavit), was a false statement within the meaning of the latter proviso, and rendered all parties to the transaction liable as general partners. *Durant v. Abendroth,* 69 N. Y. 148, 25 Am. Rep. 158; *McGinnis v. Farrelly,* 27 Fed. 33. (We

may note that these cases, dated 1877 and 1886, respectively, are among those relied on by respondent here.) Later cases, in recognition of the fact that payment by check is commonly accepted as payment in cash, relaxed this rule, and, expressing the view that, in the situation described, it would be unreasonable to hold the special partner to general liability, refused to do so. *Chick v. Robinson,* 95 Fed. 619, 52 L. R. A. 833; *White v. Eiseman,* 134 N. Y. 101, 31 N. E. 276.

But such liberality was by no means universal, and in any event did not extend to cases such as the one at bar, for the statutes commonly stated explicitly that, if publication of the certificate was not made as specified, the partnership should be treated as general. Even "substantial compliance" demanded that the requirements for publication be satisfied. *Smith v. Argall,* 6 Hill (N. Y.) 479, affirmed 3 Denio (N. Y.) 435. If they were not, the partnership was deemed general. *Davis v. Sanderlin,* 119 N. C. 84, 25 S. E. 815. As Rem. Rev. Stat., § 9969, was identical with the New York and North Carolina statutes in this respect, both the persuasive authority of the cases above cited, as well as the express wording of the statute itself, would doubtless compel us, if we held the statute binding, to find in the present case that appellant Griffith, in spite of his expressed intention to become a limited partner, was, as a matter of law, a general partner and liable as such.

But it was coming to be recognized that the strict interpretation being given to the limited partnership statutes by the courts, though it unquestionably carried out the intent of those responsible for the adoption of these statutes, was rendering this form of association commercially impracticable. See, Commissioners' note to § 1 of the uniform limited partnership act, Vol. 8, Uniform Laws Annotated, p. 2. The limited partnership statutes were quite commonly coming to be regarded as a trap (*In re Marcuse & Co.,* 281 Fed. 928); for the fact that any minor deviations from the statutory provisions might have the effect of subjecting the "limited" partners to unlimited liability, naturally rendered the limited partnership a hazardous means of obtaining limited liability, and, therefore, discouraged

its employment. Accordingly, in 1916, a uniform limited partnership act was drafted in order to remedy these deficiencies. It has since been adopted by more than half of the states (see Vol. 8, Uniform Laws Annotated, 1949 Supp., p. 6), and has been in effect in Washington since 1945. Rem. Supp. 1945, §§ 9975-1 to 9975-30, inclusive. Mr. William Lewis, the draftsman of the new act, has written of it as follows:

"Practically all the differences between the new Uniform Act and the existing statutes are due to the desire of the Conference to present to the legislatures of the several states an act, under which a person willing to invest his money in a business for a share in the profits, may become a limited partner, with the same sense of security from any possibility of unlimited liability as the subscribers to the shares of a corporation." William D. Lewis, The Uniform Limited Partnership Act, 65 U. Pa. L. Rev. 715, 723.

Representative of these remedial changes is § 11 of the act, upon which appellants here rely. Illustrating the type of situation which § 11 was intended to meet, Mr. Lewis says:

"Again, suppose a person is asked to contribute to the capital of a business conducted by a person or partnership, and that he does so, believing he has become a limited partner, but the certificate required to be filed is not filed, or being filed is so defective that no limited partnership has been formed. Under existing acts a person in the position described runs a danger of becoming a general partner, if he takes a share in the profits, and a still greater danger if he exercises a limited partner's right to look over the books and give advice to his supposed copartners. It is immaterial that he may have thought all things had been done necessary for the formation of the limited partnership, and also that the persons doing business with the partnership may at the time they extended credit believe he was a limited partner. Section 11 of the Uniform Act meets this situation, . . ."

Section 11 provides:

"A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights

of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership: *Provided,* That on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income." (Rem. Supp. 1945, § 9975-11.)

It was not long before a case arose to test the efficacy of this section, a case, moreover, like the case at bar, in that it involved a partnership which the associates did not intend to organize under the uniform act. In this case, the petitioners, Hecht and Finn, as special partners, attempted to form a limited partnership with certain others, as general partners, in the brokerage business under the old Illinois limited partnership act. A certificate, drawn in supposed compliance with this act, was duly executed and filed in the office of the county clerk of Cook county on July 2, 1917. The certificate contained what, under the old law, could possibly have been considered a false statement, in that it named only Hecht and Finn as special partners, in nominal compliance with the rules of the New York stock exchange which forbade affiliated firms having more than two such special partners; whereas, in fact, Hecht and Finn represented several others. On July 1st, however, the uniform limited partnership act had gone into effect in Illinois. This act forbade the formation of limited partnerships for the purpose of carrying on the brokerage business, and made certain new provisions for the form and filing of the certificate with which the partners did not comply.

The parties had no knowledge of the passage of the act, and they began at once to transact business. Hecht and Finn took no part in the business and were not held out as general partners; all the letterheads and other papers of the firm specified the general partners and indicated that Hecht and Finn were limited partners. Three years later the business became insolvent, and a petition in bankruptcy was filed. The creditors of the firm sought to hold Hecht and Finn as general partners, claiming that no limited partnership had been formed since the certificate had not been filed in compliance with the act, and the act forbade the

formation of limited partnerships for the brokerage business. Hecht and Finn, upon learning that this was the purpose of the creditors, paid into court the profits they had received from the firm, in attempted compliance with the provisions of § 11 of the new act. An order of the district court nevertheless found them liable as general partners. The circuit court of appeals, however, reversed (*In re Marcuse & Co.*, 281 Fed. 928), and this decision was upheld on appeal to the supreme court of the United States (*Giles v. Vette*, 263 U. S. 553, 68 L. Ed. 441, 44 S. Ct. 157). In its opinion in the later case, the court took note of the policy considerations which had prompted the drafting of the uniform act and commented as follows:

"Section 11 is broad and highly remedial. The existence of a partnership—limited or general—is not essential in order that it shall apply. The language is comprehensive and covers all cases where one has contributed to the capital of a business conducted by a partnership or person erroneously believing that he is a limited partner. It ought to be construed liberally, and with appropriate regard for the legislative purpose to relieve from the strictness of the earlier statutes and decisions. [Citing cases.] *Its application should not be restricted to cases where there was an attempt to organize a limited partnership under that act.*" (Italics ours.)

This language, considered by itself, would seem to suggest that the court intended to indicate that, in a situation such as is presented by the case at bar, § 11 should apply. However, in order to answer the contention that § 11 did not apply because of the fact that the limited partnership certificate was false, in that it did not disclose the names of all the limited partners, the court pointed out that, while, under the old act, a false statement would automatically result in the alleged special partners being held as general partners, under the new act, it was requisite that the creditor seeking to hold them as such had relied on the false statement and suffered a loss as a result. It did not appear in *Giles v. Vette* that any creditor had suffered a loss from reliance on the allegedly false statement, and for that reason nothing in the new act barred the application

of § 11; and, even if, under the old act, the special partners would have been considered general partners by reason of the false statement in the certificate, the court held that to be immaterial, for, as it emphasized, the old act was repealed before the certificate was filed, and therefore had no application whatever.

It is on the basis of this latter language of the court that respondent seeks to distinguish the case at bar. It is pointed out that there is an important difference in the facts before the court in *Giles v. Vette* and in the present case, in that, here, the attempt to organize the limited partnership, and the filing of the certificate intended to accomplish this end, took place some three years prior to the adoption of the uniform limited partnership act, at a time when the old act was still in full force and effect. Respondent calls attention to § 30 of the new act (Rem. Supp. 1945, § 9975-30), which sets forth certain requirements which must be complied with before a limited partnership, in existence prior to the adoption of the act, may become a limited partnership under the act, and states:

"(2) A limited partnership formed under any statute of this state prior to the adoption of this act, until or unless it becomes a limited partnership under this act, shall continue to be governed by the provisions of sections 9966 to 9975, inclusive, Remington's Revised Statutes, . . ."

Admittedly, neither the appellants nor Midfield Packers ever availed themselves of the statutory privilege to become a limited partnership under the uniform limited partnership act. Respondent, therefore, asserts that *Giles v. Vette* has no application, and that this attempted limited partnership must be governed by the old limited partnership statutes, and by the strict construction given those statutes by the courts.

It cannot be denied that, when § 11 is compared with § 30, and they are both considered with reference to the case at bar, a certain ambiguity appears. Section 30 states that limited partnerships formed prior to the adoption of the uniform act, unless they comply with certain requirements, shall be governed by the terms of the old

act. Section 11, on the other hand, provides, in general terms, that a person who has contributed to a business, erroneously believing that he has become a limited partner, shall not be held as a general partner. Although § 11 does not indicate that it should apply where the attempt to form the limited partnership has been made at a time when the old statutes were still in effect, it neither indicates that it should not apply in such a situation. *Giles v. Vette* did not solve the problem directly. It merely indicated that § 11 applied even where the parties did not intend to organize under the uniform act, and could not have done so by reason of the nature of their business, in a situation where the partnership certificate was filed after the adoption of the act. As the circuit court of appeals had done in *In re Marcuse & Co., supra,* the supreme court, in *Giles v. Vette,* laid considerable stress on the nonapplicability of the old statutes arising from the fact that they had been repealed prior to the filing of the certificate. This, of course, was a conclusive answer to the question of whether the old statutes, and the decisions construing them, should be applied in that case. But neither the circuit court nor the supreme court indicated directly what its decision would have been had the old statutes still been in full force and effect at the time of the filing of the certificate involved in *In re Marcuse & Co.* and *Giles v. Vette, supra.* It was not necessary for them to pass upon the problem.

When we turn to the reasoning of the courts in these two cases, however, we find that it strongly indicates that, had they been presented with a situation like that in the present inquiry, their decision would have been the same. We have quoted the portion of *Giles v. Vette* in which the court stated that the remedial application of § 11 should not be restricted to cases where there was an attempt to organize a limited partnership under that act. The following is taken from *In re Marcuse & Co.,* in which that view was elaborated:

"It is earnestly contended that because the Uniform Limited Partnership Act prohibits the formation of a limited partnership to carry on the business of brokerage, section

11 cannot in any event afford relief. But section 11 is very broad in its terms. It is not limited to instances where there has been an attempted compliance with the provisions of the new act. It includes in its terms any person who at any time contributed to a partnership, erroneously believing himself to be a limited partner.

"There are other sections which amply provide for the correction of errors and irregularities in organization and for amendment of statements in accordance with the facts, thereby perfecting and confirming the special partnership, without incurrence of general liability. This section is not designed to amend or correct or perfect the limited partnership organization, so that it may thereafter continue as such, but looks rather to the termination of the relation, and relief from general liability on compliance with the terms of the section in all those cases where persons erroneously believed they had become limited partners, *without regard to whether or not the belief was induced by supposed compliance with this or any other act.* This view not only comports with the words of the section, but with the evident general purpose of the act to give effect, so far as may be done, to the bona fide intent of parties, and to relieve from the extreme consequences of honest mistakes, which the prior law and its strict interpretation entailed. The erroneous belief may be as to the nature of the business which may be organized into a limited partnership as well as to any other matter of law or of fact, which induced the error. *In this respect we do not conceive section 11 to be different in its effect as part of the new law than if it had been adopted as an amendment to the old.*" (Italics ours.) (281 Fed. 928, 935.)

It would seem from the language of the *Marcuse* and *Giles* cases, which we have quoted, that it was the intention of the circuit court of appeals, and of the supreme court, to lay down a rule that § 11 was to apply to *all* cases where an individual had entered upon a supposed limited partnership with the intent that he should be liable only as a special partner, provided, of course, that no creditors had been misled, to their loss, by any misrepresentations to which he was a party. The broad language employed seems quite adequately to cover those situations where the individual attempted to become a limited partner in a partnership defectively organized under the old acts, as well as

under the uniform act; and the persuasive effect of this language would seem to be sufficient in itself to suggest a resolution of any ambiguity in the statute in favor of the contention of such an individual that he should not be held as a general partner in this type of situation. In addition, this solution is plainly in accord with the policy of the uniform act, which, as we have shown earlier in this opinion, was expressly designed to relieve the hardship consequent in holding liable as general partners those who intended in good faith to become limited partners, but were held not to occupy that status by reason of errors in the formation of the partnership for which they were not responsible.

But the application of § 11 to relieve the intended limited partner, in a situation such as that presented by the case at bar, has support in authority, as well as in reason. *Baumer Foods v. Griffith*, 166 F. (2d) 433, was an appeal from a judgment in the district court of the United States for the western district of Washington, southern division. That action, like those with which we are here concerned, was brought by a creditor of the Midfield Packers against the partners of the firm. Mr. Griffith was named in the complaint as one of the partners, but, in the answer, it was alleged that he was only a limited partner. With the exception of certain documents intended to show the extent of Mr. Griffith's participation in the business, which were introduced for the first time in the present case, the evidence introduced was substantially the same as that introduced here. The district court, after taking testimony, made findings of fact and conclusions of law, and rendered a judgment (unreported), to the effect that Mr. Griffith was never a general partner in the firm of Midfield Packers, but was only a limited or special partner in the concern. In its oral opinion, the court pointed out that *Giles v. Vette* had been in existence for many years when the legislature of the state of Washington adopted the uniform limited partnership act, and therefore that it was necessary to presume that the legislature, in adopting the act, did so with

full knowledge of that decision. The court further stated, of *Giles v. Vette,* that:

"There is every indication from that opinion that it was carefully and well considered, and was written for the purpose, not alone of meeting the situation presented by the particular problem before the court at the time, but any similar problem that might arise under this uniform act."

The circuit court of appeals affirmed the decision of the district court, in a laconic opinion reading as follows:

"The judgment of the District Court is affirmed upon the authority of *Giles v. Vette,* 263 U. S. 553, 44 S. Ct. 157, 68 L. Ed. 441." 166 F. (2d) 433.

The plaintiff in the case then petitioned for a writ of certiorari in the supreme court of the United States; but the petition was denied. *Baumer Foods v. Griffith,* 334 U. S. 828, 92 L. Ed. 1756, 68 S. Ct. 1339.

■ While we do not attach any particular significance to the denial of the writ of certiorari (since such denial imports no expression of opinion on the merits of the case, *Atlantic Coast Line R. Co. v. Powe,* 283 U. S. 401, 75 L. Ed. 1142, 51 S. Ct. 498), the circumstance that two Federal courts have held the principle of *Giles v. Vette* applicable to the state of facts now before us is one which merits the most serious consideration. In any event, the view taken by these courts is quite in accord with our own.

We hold, therefore, that § 11 will apply to relieve all those persons who have erroneously believed they have become limited partners, either in a partnership organized under the old statutes, or in one organized under the uniform act.

■ Respondent points out, however, that § 11 requires that, in order for a person erroneously believing himself to be a limited partner to escape liability as a general partner, he must, upon discovering his mistake, promptly renounce his interest in the profits of the business. It is the claim of respondent that no proper renunciation was made in this case. But the statute does not specify any particular form which this renunciation should take. It will be recalled

that Mr. Griffith never took any profits from this business, and so was not under any obligation to pay them into court, as was done by Hecht and Finn in the case of *Giles v. Vette.* He did, however, execute a bill of sale by the terms of which he conveyed all of his interest in the limited partnership to the general partners in the concern. This appears to have been done as soon as he learned that the creditors of the Midfield Packers were attempting to hold him as a general partner.

We think this relinquishing of all of his claims against the assets of the Midfield Packers was sufficient compliance with the requirements of § 11. Apparently, this was the view taken by the district court and the circuit court of appeals when they considered the matter in the *Baumer Foods* case, *supra.*

But respondent urges that Mr. Griffith, by reason of his activity in the affairs of the alleged limited partnership, lost his status as a special partner and became a general partner. It is true that among the instruments introduced in evidence was one entitled "BY-LAWS OF MIDFIELD PACKERS, A Limited Co-Partnership," which provided that the affairs of the partnership should be handled by a board of directors composed of three members of the copartnership; and that Mr. Griffith was named therein as one of the directors. However, he testified that he never functioned as such, and, in fact, respondent, in his brief, does not appear to contend, and Mr. Griffith vigorously denies, that he in any sense managed the affairs of the concern or had the power to initiate and control the execution of policy. Respondent's charge of unwarranted participation is largely based upon two warranty deeds in which the grantees are named as "Herbert H. Huber, G. I. Griffith, and Harold A. Schmitt, copartners doing business as Midfield Packers"; and upon a number of documents purportedly executed by Mr. Griffith, together with the admitted general partners, as copartner in the firm of Midfield Packers. These include a power of attorney, purporting to be signed by the general partners, and by Griffith, "d/b/a Midfield Packers"; an agreement

with the Peoples National Bank, signed by the general partners and by Griffith, "d/b/a Midfield Packers"; an instrument purporting to be a contract, signed by Griffith for Midfield Packers; and certain leases, signed by the general partners and by Griffith, "Partners doing business under the firm name of Midfield Packers." It does not appear that respondent was acquainted with most of these exhibits, or that he extended credit to the partnership on the faith of Mr. Griffith's apparent status as a general partner. One of the warranty deeds, first mentioned above, was introduced in the *Baumer Foods* case; and the following finding of fact was also made by the court therein:

"That the defendant, G. I. Griffith, took no part in the business of the Midfield Packers except that some time in the spring of 1945 he accompanied the managing partner, H. H. Huber, to Seattle to negotiate a loan from the Sun Life Assurance Company with which to construct a building for said partnership, and negotiated with A. G. Homann, a contractor, for the construction of said building."

In spite of this finding, neither the Federal district court nor the circuit court of appeals appears to have had any difficulty in holding that Mr. Griffith remained a limited partner. Although the evidence introduced in this case indicates a greater participation in the business by Mr. Griffith than did the evidence introduced in the *Baumer Foods* case, it does not appear to be different in quality or to indicate that his status in the concern varied in any degree from his status as it appeared to the courts which decided that case. We call attention once more to the fact that it is not alleged that respondent ever relied on Mr. Griffith's position as a general partner, or in fact ever understood that Mr. Griffith was anything other than a limited partner. Under these circumstances, we see no reason for holding Mr. Griffith liable to respondent as a general partner.

The record indicates that the trial judge was originally of the opinion that Mr. Griffith could not be held as a general partner by virtue of the language of *Giles v. Vette*. Subsequently, he changed his view, but we are in agreement with the opinion earlier expressed. It appears to us that,

Mr. Griffith not having intended to be, and not having been in fact, a general partner in the Midfield Packers, he should not be held liable for the debts herein involved.

The judgments appealed from are accordingly reversed, and the causes dismissed as to the appellants.

SIMPSON, C. J., MALLERY, and HAMLEY, JJ., concur.

HILL, J. (dissenting)—I dissent. I could agree with the majority's interpretation of the applicability of § 11 of the limited partnership act (Rem. Supp. 1945, § 9975-11) were it not for § 30 of the act, subd. (2) of which reads:

"(2) A limited partnership formed under any statute of this state prior to the adoption of this act, until or unless it becomes a limited partnership under this act, shall continue to be governed by the provisions of sections 9966 to 9975, inclusive, Remington's Revised Statutes, except that such partnership shall not be renewed unless so provided in the original agreement." (Rem. Supp. 1945, § 9975-30.)

The majority writes this subsection out of the statute. I cannot agree that we have the right so to do. And, to be what the majority refers to as laconic, I believe the portion of the section quoted means what it says.

---

August 14, 1950. Petition for rehearing denied.