[Nos. 6556–1–III; 6862–5–III.   Division Three.   June 10, 1986.]

JOHN B. MOLANDER, ET AL, *Respondents,* v. RAUGUST–MATHWIG, INC., ET AL, *Appellants.*

*William J. Powell* and *Powell & Morris,* for appellants.

*Brian G. Hipperson, Alexander J. Shogan, Jr.,* and *Gordon, Hipperson, Shogan & Devlin,* for respondents.

THOMPSON, J.—Calvin Raugust appeals a personal judgment against him for $447,011.97 found to be owing to John Molander for architectural fees incurred in the design of two development projects located in Spokane: Riviera Towers, and the Raugust–Mathwig Professional Office Tower. Mr. Raugust contests personal liability for that judgment and further argues $89,621 of the judgment was barred by the statute of frauds and asserts the trial court had no jurisdiction to conduct supplemental proceedings under RCW 6.32.190. Mr. Molander cross–appeals, raising issues concerning prejudgment interest and the applicable rate of interest. We reverse.

On May 9, 1973, John Molander, an architect, entered into a standard American Institute of Architects (AIA) agreement with W. J. Mathwig, Inc.[1] to design a condominium apartment complex known as Riviera Towers. On March 7, 1974, the same two parties signed a second AIA

---

[1]W. J. Mathwig, Inc., owned by W. J. Mathwig, was established in 1962 and filed for bankruptcy in 1981.

contract for the design of an office building and parking structure, which was later named the Raugust–Mathwig Professional Office Tower. On March 2, 1977, these two contracts were amended reducing the architect's fee and substituting Raugust–Mathwig, Inc., and Associates[2] as designated owner of the properties. The amended contracts on AIA forms were prepared by Mr. Molander and signed by W. J. Mathwig, as vice–president and manager of Raugust–Mathwig, Inc., and Associates. Although the typewritten name of Calvin Raugust, designated president of Raugust–Mathwig, Inc., and Associates, was included on the contracts, he did not sign them. The limited partnership agreement was never executed, but the parties opened a bank account, hired personnel and used its name on the amended architectural agreements.

Because an architect is paid the bulk of his fees when financing is secured, Mr. Molander decided not to proceed beyond the design development stage without reassurances regarding financing. On April 12, 1978, he received a letter, written on W. J. Mathwig, Inc., stationery, which assured continued financing:

The Molander Associates, Architects
P.O. Box 7928, Rosewood Station
Spokane, Washington 99208

Re: Riviera Towers
A Residential Condominium
West 700 Mallon

Gentlemen:

You are hereby authorized to prepare final contract documents for construction of the above project in accordance with approved preliminary plans and outline specifications and the executed A.I.A. Standard Form of Agreement between Owner and Architect, A.I.A. Docu-

---

[2]Raugust–Mathwig, Inc., and Associates was to be a limited partnership set forth by corporate resolution February 7, 1977. Raugust–Mathwig, Inc., was designated the general partner. Limited partners were Cal–Lee Trust, W. J. Mathwig, Inc., and Associates, and W. J. Mathwig, Inc. The validity of the entities comprising this planned limited partnership was not challenged.

ment B131, April 1970 Edition.

Final contract documents with the selected project general contractor, Lydig Construction, Inc.; and mechanical contractor, McClintock and Turk, Inc.; and electrical contractor, Power City Electric, Inc.; shall be prepared on the basis of A.I.A. Document A111, Owner–Contractor Agreement, cost of the work plus a fee.

Financing of the project has been assured and a commitment in hand.

You are requested to prepare the above documents, make application for the necessary permits as soon as practicable. Please submit a statement of accounts such that arrangements may be made by this office to satisfy outstanding balance of planning fees for you and your consultants by May 1, 1978.

Sincerely yours,
/s/ Franklin L. Smalley
Franklin L. Smalley
Vice President

The court made a finding that Mr. Raugust was aware of the contents of the letter, "although his memory at this time may be clouded as to the event".

On approximately May 1, 1978, work was stopped on the office tower because Mr. Mathwig was unable to secure the necessary city permits. Approximately 35 percent of the architect's fee had been earned at that time. Work continued on Riviera Towers until Mr. Molander realized financing would not be forthcoming, sometime in 1979. Eighty percent of the architect's fee had been earned at the time of that work stoppage.

Mr. Raugust contends substantial evidence was not presented to support the decision to impose personal liability on him, either as a promoter, or on theories of reliance or unjust enrichment, arguing every monetary transaction, except the first $15,000, was made by either a valid corporation or trust. Further, he argues the corporate minutes of Raugust–Mathwig, Inc., directed Mr. Mathwig to form the limited partnership of Raugust–Mathwig, Inc., and Associates, and the amended AIA contracts, which listed Raugust–Mathwig, Inc., and Associates as the owner, were

signed only by Warren J. Mathwig. The role of promoter, if present, was played, he urges, by either Borderline Enterprises,[3] which advanced the $500,000 needed to keep the project afloat, or Cal–Lee City Estates,[4] which held the stock of Raugust–Mathwig, Inc. Other than serving as president and chairman of the board of Raugust–Mathwig, Inc., the proposed general partner, and Raugust–Mathwig, Inc., and Associates, the unperfected limited partnership, Mr. Raugust argues he had no individual involvement upon which personal liability could be based. We agree.

Citing *Dwinell's Cent. Neon v. Cosmopolitan Chinook Hotel*, 21 Wn. App. 929, 587 P.2d 191 (1978) and *Goodman v. Darden, Doman & Stafford Assocs.*, 100 Wn.2d 476, 670 P.2d 648 (1983), the trial court defined Mr. Raugust as a promoter and found him personally liable for contracts made for the benefit of the contemplated partnership. The court concluded it was reasonable for a lay person to assume the partners of the entity were Mr. Raugust and Mr. Mathwig, as evidenced by the signature on the contract which included both men's names, albeit one typed and one signed.

In Washington, parties may form a limited partnership with a corporation as the sole general partner, so long as statutory requirements are met. *Frigidaire Sales Corp. v. Union Properties, Inc.*, 88 Wn.2d 400, 402, 562 P.2d 244 (1977). Here, the limited partnership was to be comprised of general partner Raugust–Mathwig, Inc., and limited partners Cal–Lee Trust, W. J. Mathwig, Inc., and Associates, and W. J. Mathwig, Inc.

█ █ Since it is undisputed the parties failed to perfect the limited partnership, we must look to the would–be partners' liability as promoters of a business enterprise and

---

[3]Borderline Enterprises: Mr. Raugust's farm corporation (formed November 1, 1975), registered in Washington, in which he and his wife have a majority interest. Over $1.1 million was passed to Mathwig entities through this corporation.

[4]Cal–Lee City Estates was a common law trust in existence for only 3 to 4 months to hold shares of Raugust–Mathwig, Inc.

as general partners, *Dwinell's Cent. Neon,* at 935–36. A promoter is defined as "one who alone or with others forms a corporation and procures for it the rights, instrumentalities and capital to enable it to conduct its business". *Goodman,* at 478 n.2, citing 1 W. Fletcher, *Private Corporations* § 189 (1974).

> [W]here a corporation is contemplated but has not yet been organized at the time when a promoter makes a contract for the benefit of the contemplated corporation, the promoter is personally liable on it, even though the contract will also benefit the future corporation.

*Harding v. Will,* 81 Wn.2d 132, 139, 500 P.2d 91 (1972). *Goodman,* at 478–79.

The liability of the promoter for a contract will depend upon the terms of the contract and the intent of the parties. 1A W. Fletcher, *Private Corporations* § 215 (1983). There is a strong inference that a person intends to make a contract with an existing entity, rather than the to–be–formed corporation. *Goodman,* at 479; *White & Bollard, Inc. v. Goodenow,* 58 Wn.2d 180, 184, 361 P.2d 571 (1961). Finally, corporations may be promoters if such acts are within their powers. 1A W. Fletcher § 189, at 337.

Here, the record supports the inference Mr. Molander intended to contract with existing entities. Although the exact form of the entities may not have been clear at the time, Mr. Molander testified he believed he was contracting with a corporation. Responding to a question by the court, he stated the diverse interests involved rendered it unnecessary to obtain "personal" liability of the individuals, thus indicating he was not looking to the personal liability of Mr. Raugust, but rather to the liability of the entities combining to form the limited partnership. Promoter liability, therefore, if at all, should have been assigned to Raugust–Mathwig, Inc., Cal–Lee Trust, W. J. Mathwig, Inc., and Associates, and W. J. Mathwig, Inc.

There are no corporate minutes, letterhead, contract language or testimony of any kind in the record that would

support a finding Mr. Raugust was to be either a limited or general partner in Raugust–Mathwig, Inc., and Associates. Since corporations may enter into limited partnerships and the validity of the corporate partners was unchallenged, the failure of the limited partnership resulted in general partnership liability of the corporate entities, not Mr. Raugust personally.

No testimony was presented that the failure to form the partnership was for fraudulent or deceptive purposes. Moreover, Mr. Molander was never led to believe the parties were acting in anything other than their corporate capacities.

> When the shareholders of a corporation, who are also the corporation's officers and directors, conscientiously keep the affairs of the corporation separate from their personal affairs, and no fraud or manifest injustice is perpetrated upon third persons who deal with the corporation, the corporation's separate entity should be respected.

*Frigidaire Sales,* at 405.

█ Doing business as an association or a corporation is not illegal and complexity in business relationships alone is not a basis for imposing liability. The doctrine of corporate disregard will not be applied in the absence of proof that (1) the corporate form was intentionally used to violate or evade a duty, and (2) disregard is required to prevent an unjust loss to an injured party. *Lindsay Credit Corp. v. Skarperud,* 33 Wn. App. 766, 770–71, 657 P.2d 804 (1983). Few people are aware of the organizational intricacies of businesses with which they are dealing and unless there is an agreement to be personally liable, absent fraud or a similar basis, personal liability cannot be imposed just because a person seeks to insulate himself by doing business through a corporate entity. A professional architect doing business in a complex financial world cannot escape the legal consequences of failure to protect himself by professing ignorance as to corporate and partnership liability. Subjective expectations or postdisaster wishful thinking is not a substitute for legal advice and appropriate contract

language.

■ It is difficult to find support in the record for the court's finding that Mr. Raugust had personal knowledge of the letter misrepresenting financing and that Molander Associates was justified in relying on payment for the work. Mr. Smalley testified Mr. Mathwig gave him the letter, instructed him to sign it, and Mr. Smalley said he did not discuss the contents of the letter with Mr. Raugust. Mr. Raugust stated he had no knowledge of the contents of the letter. Mr. Mathwig's testimony in response to a question as to whether Mr. Raugust knew about the letter was in rather vague words to the effect Mr. Raugust participated in authorizing the preparation of the letter. However, the court made no finding as to when Mr. Raugust knew of the contents of the letter and no testimony indicates Mr. Raugust participated in the preparation or issuance of the letter. Nevertheless, where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the finding and, if so, whether the finding in turn supports the court's conclusions of law and judgment. *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Since we cannot substitute our judgment for that of the trial court, we defer to the trial court's finding that Mr. Raugust had personal knowledge of the misrepresentation regarding financing.

However, the finding of personal knowledge does not support the trial court's conclusion and to use this fact alone as a basis for imposing personal liability on Mr. Raugust was error. Neither the court's opinion nor the findings of fact and conclusions of law elaborate upon what legal theory the imposition of liability is based. Mr. Molander testified here, as is usually the case, he looked first to financing for payment and then to the corporation. There were no oral or written promises on the part of Mr. Raugust to personally pay the architect's fee. Mr. Molander did not testify to any reliance on any promises or deceptive acts by Mr. Raugust. Mere failure to warn Mr. Molander at some indeterminate time that an erroneous letter had been

issued is not sufficient to warrant disregard of the corporations and impose personal liability on Mr. Raugust.

The additional claim of unjust enrichment alluded to by counsel but not specified in the conclusions likewise is not supported by the record. Unjust enrichment arises when money or property has been placed in one person's possession such that in equity and good conscience he should not retain it. *Family Med. Bldg., Inc. v. Department of Social & Health Servs.*, 104 Wn.2d 105, 112, 702 P.2d 459 (1985). Moreover, a party must make restitution when he has been unjustly enriched at the expense of another. *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 909, 691 P.2d 524 (1984), *cert. denied*, 471 U.S. 1065, 1075 (1985), citing Restatement of Restitution § 1 (1937). Justice does not require restitution where no benefit passes, *Chemical Bank*, at 911–12, or where the contracting party receives nothing more than what he paid for. *Farwest Steel Corp. v. DeSantis*, 102 Wn.2d 487, 493, 687 P.2d 207 (1984), *cert. denied*, 471 U.S. 1018 (1985).

Mr. Raugust was not the beneficiary of a windfall at the expense of the Molanders. Although the record establishes plaintiffs earned the fee they now claim, their personal architectural services conferred no benefit personally to Mr. Raugust. His corporations did realize tax advantages, but those benefits were corporate and do not appear to have offset the substantial investments made by Mr. Raugust's corporations in the failed projects.

The Molanders did not perform services, work, or make a contribution that increased or enhanced the value of any of the property that eventually ended up in a Raugust entity. Some of the property was owned by Raugust interests prior to the parties entering into the March 2, 1977 AIA contracts. For the doctrine of unjust enrichment to apply, some benefit must be conferred on one party to the detriment of the other and denying recovery would result in an unfair result. If the projects had been undertaken and buildings had been raised using plaintiffs' architectural drawings and Mr. Raugust was allowed to take his improved property

without compensating the Molanders, the doctrine of unjust enrichment could be applicable. In that instance, presumably the enhanced value of the Raugust property due to services rendered by Mr. Molander would make the doctrine applicable.

Here, the architects' services conferred no benefit on either the property or Mr. Raugust or any of Mr. Raugust's entities. Therefore, the doctrine is inapplicable. Judgment may not be granted and valid corporate forms be set aside based solely on the fact one party suffers a greater loss than another, or one party is financially better able to sustain the loss than another. The record establishes no basis to support a finding of unjust enrichment.

Because we find the evidence did not support the imposition of personal liability on Mr. Raugust, the remaining issues become moot.

Reversed.

GREEN, C.J., concurs.

McINTURFF, J. (dissenting)—I dissent. The majority's opinion could be described as "the case of the missing corporation", for nowhere does the opinion state which corporation or trust is protecting Mr. Raugust from personal liability.[5] "[C]omplexity in business relationships alone is not a basis for imposing liability" (majority opinion, at 59), nor is it a reason to foreclose liability. Although the majority is correct in its recitation of legal principles with respect to promoter liability, this fact alone, under the circumstances of this case, is not enough to reverse the judgment. The trial court also found Mr. Raugust to be personally liable under the principles of general partnership law. On that basis, I would support the trial court's judgment.

The majority indicates there is no contract language or

---

[5]Although footnote 2 in the majority opinion indicates Raugust–Mathwig, Inc., was to be a general partner, the opinion does not state whether it is this corporation or one of Mr. Raugust's many trusts, which provides the corporate shield.

testimony to support the finding Mr. Raugust "intended" to be a partner in the enterprise. But, when ascertaining liability under a contract, subjective intentions must give way to the express language of the document. As stated in *Barclay v. Spokane,* 83 Wn.2d 698, 700, 521 P.2d 937 (1974):

> In interpreting a contract our purpose is to ascertain the intent of the parties, but that does not mean that we are to be guided by the unexpressed subjective intent of a party. Rather we are controlled by the objective manifestation of intent as expressed in the writing. *Jacoby v. Grays Harbor Chair & Mfg. Co.,* 77 Wn.2d 911, 468 P.2d 666 (1970).

*See also Donald B. Murphy Contractors, Inc. v. State,* 40 Wn. App. 98, 696 P.2d 1270 (1985). Both of the amended AIA contracts involved in this action were signed in the following manner:

> Owner /s/ Warren J. Mathwig [signature]
> Vice–president–manager [handwritten]
> Calvin W. Raugust, President]
> Raugust–Mathwig, Inc., and Assoc.]—[typed]
> North 807 Howard Street]
> Spokane, Washington 99201]

The printed name of the limited partnership, Raugust–Mathwig, Inc., and Associates, must be disregarded for it was never perfected under RCW 25.10.080.[6] A partner who engages in activities which promote the partnership without the protection of a perfected limited partnership agreement, bears the same liability as a general partner. *Dwinell's Cent. Neon v. Cosmopolitan Chinook Hotel,* 21 Wn. App. 929, 935–36, 587 P.2d 191 (1978). To secure the protection of a limited partnership, the statutory requirements must be met. *See* RCW 25.10.080; RCW 25.10.110;

---

[6]RCW 25.10.080 provides in pertinent part:

"(1) In order to form a limited partnership two or more persons must execute a certificate of limited partnership. The certificate shall be filed in the office of the secretary of state and set forth: . . .

"(2) A limited partnership is formed at the time of the filing of the certificate of limited partnership . . ."

*Frigidaire Sales Corp. v. Union Properties, Inc.,* 14 Wn. App. 634, 636, 544 P.2d 781 (1975), *aff'd,* 88 Wn.2d 400, 562 P.2d 244 (1977); *Rathke v. Griffith,* 36 Wn.2d 394, 396, 218 P.2d 757, 18 A.L.R.2d 1349 (1950). It is undisputed the limited partnership agreement (unlike the AIA contracts) was never signed nor the certificate filed. Thus, I conclude that neither individual was afforded the protection of the limited partnership.

The majority notes Mr. Molander stated he believed he was contracting with a corporation; therefore, he must be limited in his recovery to corporate funds. Yet, it is clear from the AIA contracts there was no corporate contracting party, only the name of a statutorily unperfected limited partnership. Nor does the majority cite any authority for its conclusion Mr. Molander must be limited to recovery only from corporate funds because he believed he was contracting with a corporation. Under the analysis of the majority, it would not be necessary to formally organize a limited partnership—merely to convince one's business associates that the partnership was in existence—in order to receive the protection of limited liability.

Finally, there is testimony from Mr. Molander that Mr. Raugust was described to him as a "partner" to Mr. Mathwig, and that Mr. Molander was not worried about collecting his fee because he knew Mr. Raugust was a "wealthy wheat farmer."[7] There is substantial evidence to support the court's conclusion that the two men were partners: even

---

[7]Mr. Molander testified:

"Q. I want to clear that up. The $500,000—was this mentioned before you signed the 1977 contracts?

"A. Oh, yes.

"Q. And, was this, in your view, one of the reasons you did not question what entity you were dealing with in 1977?

"A. Yes, it didn't make any difference to me.

"Q. After learning of Mr. Raugust's financial involvement?

"A. That's right.

"Q. Did you know of Mr. Raugust or his background at that time—who he was or where he came from?

"A. At that time? Yes, I did.

though Mr. Raugust did not personally sign the contracts, he knew of them, was instrumental in obtaining the lower architectural fee,[8] and had instructed Mr. Mathwig to execute the AIA contracts for him.[9] These conclusions are readily apparent upon reviewing the corporate minutes of a special meeting of the directors of Raugust–Mathwig, Inc., dated and signed by Calvin Raugust:

> The manager is to construct a sales mockup of Riviera Towers, as designed by the Molander Associates . . . The Molander Associates are to do drawings of two buildings, residential and office.

Following the execution of the contracts, Mr. Raugust periodically reviewed Mr. Molander's work, attended meetings with him and allowed use of his name and credit history in the futile attempt to secure financing. Thus, he knew of the extensive work being done by Mr. Molander, yet never notified him to stop, even after his self–avowed separation from Mr. Mathwig in July 1977.[10] Work halted on the office tower on approximately May 1, 1978, and continued on

---

"Q. And, what was your impression of Mr. Raugust? I'm speaking now, not of him as a person, but simply what was your perception of him as an individual who could stand in the stead of a partner?

"A. I knew him to be, in layman's terms, a wealthy wheat farmer, and an investor."

[8]Mr. Mathwig testified:

"I was told to change the contracts from the corporation to this new corporation and, also, I was told if I could get it from 7 percent down to 6 percent, why, we should do that . . .

"Q. So as of February, 1977, you discussed with Mr. Raugust the need for negotiating and executing new architect contracts?

"A. Yes . . ."

[9]The court questioned Mr. Mathwig:

"Q. Before the contracts were executed, Mr. Raugust instructed you to sign them?

"A. Yes, he said, "you sign them" and I signed them. His name was on them and I told him his name was on them and he said, "sign them" and I said, "I'll sign as manager and vice–president," and that's what I was instructed to do and I signed everything, Your Honor."

[10]In response to questions by the court, Mr. Raugust testified:

Riviera Towers until sometime in 1979.

The majority concludes the trial court failed to elaborate on the particular legal theory which resulted in a finding of personal liability against Mr. Raugust. Reference to conclusion of law 3.2[11] confirms that the trial court predicated liability upon theories of promoter and general partnership law, as well as unjust enrichment.

The fact Mr. Mathwig actually signed the AIA contracts, or the fact financing came from sources other than Mr. Raugust's personal account, does not absolve Mr. Raugust of liability as a general partner. The majority's reference to "postdisaster wishful thinking" is more correctly applied to Mr. Raugust's actions than to Mr. Molander's. Mr. Raugust had the opportunity to protect himself through a corporate shield by using the name of a corporation as the general partner on the AIA contracts. But Mr. Raugust did not do so. Hence, the liability under the contract rested upon the name of the limited partnership, which was never statutorily perfected, and two individuals. So in essence, Mr. Molander contracted with two individuals and an unperfected limited partnership. Under these circumstances those two individuals were general partners, thus personally liable.

Since the bulk of the architectural work was done after Mr. Molander received assurances by letter from Mr. Smalley regarding financing, it is important to address Mr. Raugust's liability based on that particular letter. The question is whether Mr. Raugust knew the letter had been sent. The trial court concluded, and the majority defers to its conclusion, that he, in fact, did know of the letter

---

"Q. Was there a point you divorced yourself from all these things and if so, when was it?

"A. July 1, 1977."

[11]Conclusion of law 3.2 states:

"Because the limited partnership above–referred never legally existed, Calvin W. Raugust was personally liable as a promoter of this entity—which was, in effect, a general partnership."

although his memory of the event may have been "clouded". However, the majority finds this misrepresentation insufficient to impose personal liability on Mr. Raugust. While, arguably, his neglect to inform Mr. Molander of the erroneous information may not be sufficient to pierce a corporate veil, piercing the veil is not an issue here. Liability is founded on a general partnership theory; there is no Raugust corporation or trust specifically named in the contract; thus, there is no veil to be pierced.

Because I find liability based on general partnership law, discussion concerning unjust enrichment is unnecessary, but there are other issues which should be addressed.

Mr. Raugust's next principal argument concerns Mr. Molander's right to recover $89,621[12] incurred in fees prior to the execution of the amended contract. It is suggested that this amount is barred by the statute of frauds. RCW 19.36.010 provides:

> Contracts, etc., void unless in writing. In the following cases, specified in this section, any agreement, contract and promise shall be void, unless such agreement . . . be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized, that is to say: . . . (2) Every special promise to answer for the debt, default, or misdoings of another person;

*Morrison–Knudsen Co. v. Hite Crane & Rigging, Inc.*, 36 Wn. App. 860, 863–64, 678 P.2d 346, *review denied*, 101 Wn.2d 1020 (1984), disposes of this issue:

> in determining whether a promise falls within the statute, our courts distinguish between collateral and original promises. If the promise was collateral, it is within the statute of frauds; if original, the statute does not apply. A promise is considered original when the promisor receives some consideration or benefit from the promise. . . . If the leading object is to benefit the promisor, it does not

---

[12]See exhibit 3, amended AIA contract, p. 2, totaling $63,521.26 due and owing for architectural work done on Riviera Towers and exhibit 4, amended AIA contract, p. 2, totaling $26,100 due and owing for architectural work done on the office tower.

matter if the effect of the promise is to pay the debt of another.

(Citations omitted.) The *Morrison–Knudsen* court then outlines three basic fact patterns, including one similar to the Raugust–Mathwig–Molander situation, where the statute of frauds would control unless Mr. Raugust received a direct benefit from Mr. Molander. That benefit was the completion of the plans by Mr. Molander based upon his prior architectural work which would have enabled the development to proceed to fruition. Thus, when Mr. Raugust allowed the services to continue, there was a direct benefit to him which removed the agreement from the statute of frauds. Additionally, this sum was contained in the amended AIA contracts, which we have held to be personal liabilities of Mr. Raugust. I find no error.

Next, Mr. Raugust states the court erred in requiring him to appear in Spokane County Superior Court for a hearing pursuant to RCW 6.32.190,[13] when he neither resided nor maintained a business in Spokane County. *State ex rel. McDowell v. Superior Court,* 152 Wash. 323, 277 P. 850 (1929) determined that the examination of a judgment debtor is not an independent action, but is ancillary to and a continuation of the original action. When Mr. Raugust did not challenge venue in the original action, he waived it. CR 12(h)(1).[14] Additionally, the property was located in Spokane County and the business between Raugust and Mathwig was conducted here. I find no error.

---

[13]RCW 6.32.190 provides in part:

"A judgment debtor who resides or does business in the state cannot be compelled to attend pursuant to an order made under the provisions of this chapter at a place without the county where his residence or place of business is situated."

[14]CR 12(h)(1) provides:

"A defense of . . . improper venue, . . . is waived (A) if omitted from a motion in the circumstances described in section (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by rule 15(a) to be made as a matter of course."

Finally, Mr. Molander raises two issues on cross appeal. He first questions the court's decision to deny prejudgment interest on the sum computed as due and owing on work done subsequent to the execution of the amended AIA con-tract. Reviewing the court's first supplemental opinion and the findings of fact, I note the following: (1) The sum of $63,521.26 noted on exhibit 3, dated March 2, 1977, as the amount past due for services on Riviera Towers. (2) The sum of $26,100 noted on exhibit 4, dated March 2, 1977, as the amount past due for services on the office tower. Those sums totaled $89,621.26, from which the court subtracted a payment made after March 2, 1977, of $63,900, leaving a balance due of $25,721.26. In conclusion of law 6.2, the court noted this balance was a liquidated amount and prejudgment interest would be owed thereon from that date at the legal rate. The only dispute by Mr. Raugust is that there was no "billing" to set accrual of interest into motion. However, with respect to the balance due on work prior to March 2, 1977, that amount was clearly set forth in the amended AIA contracts which I have previously determined were reviewed by Mr. Raugust.

Mr. Molander contends prejudgment interest is due on the value of the work done after March 2, 1977, a balance due of $361,724 on the Riviera Towers project, and $46,492 due on the office tower. He argues these amounts could be determined solely with reference to the AIA contract and for that reason, prejudgment interest should have been allowed. *Silverdale Hotel Assocs. v. Lomas & Nettleton Co.*, 36 Wn. App. 762, 677 P.2d 773 (1984); *Langston v. Huffacker*, 36 Wn. App. 779, 790, 678 P.2d 1265 (1984). It is true the court arrived at the Riviera Tower fee by reference to the fee schedule outlined in the AIA contract. However, the figure was based on a construction estimate of $13,397,211 submitted by the Goebel Construction Co. Mr. Molander was unable to state the date he received that

particular estimate.[15] Thus, the court had no date from which to commence computing the interest. Pursuant to *Refrigeration Eng'g Co. v. McKay,* 4 Wn. App. 963, 486 P.2d 304 (1971), the lack of such a date is fatal to an award of prejudgment interest.

With reference to the office tower, the court notes in its opinion that work stopped May 1, 1978, at which time the estimated cost of construction was $3,874,397. Based on the fee schedule contained in the AIA contract, the additional sum owed for work completed after March 2, 1977, was $46,492. Although Mr. Raugust has assigned error to this conclusion, his argument is based on the contention he is not personally liable for any of the amounts due, rather than the specific damages mentioned, or the date prejudgment interest commences.

Reference to the AIA contract section 6.5 discloses "Payments due the Architect under this Agreement shall bear interest at the legal rate commencing sixty days after the date of *billing.*" (Italics mine.) The only billing made by the Molanders for services after March 2, 1977, was dated May 1, 1981, and contains amounts which differ significantly from the judgment awarded by the court. I find insufficient notice to Mr. Raugust of the amounts due in order to begin accrual of prejudgment interest. I would affirm the court's ruling prejudgment interest is due only on the prior balance of $25,721.26, contained in the March 2, 1977 contracts.

The court awarded interest of 6 percent and denied Mr. Molander's request for 12 percent, to which he assigns error based upon *Smith v. Olympic Bank,* 103 Wn.2d 418, 425, 693 P.2d 92 (1985), which held: "The rate of prejudgment interest is governed by RCW 19.52.010 which was amended

---

[15]We note exhibit 108 is a cover letter from Robert Goebel, president of Goebel Construction, dated October 17, 1978, addressed to Mr. Mathwig, with the identical bid attached. However, Mr. Molander stated he received this bid in the spring of 1979.

on July 21, 1981 to allow a rate of 12 percent interest instead of 6 percent." Therefore, whatever prejudgment interest is awarded to plaintiffs should be at the rate of 6 percent until July 25, 1981, and from July 26, 1981, and thereafter such prejudgment interest should be at the rate of 12 percent. Mr. Raugust concedes this is the correct interest rate. Therefore, I would modify the trial court's award to reflect the increased interest rate as of July 26, 1981.

Review denied by Supreme Court September 2, 1986.